(No. 20800.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PETER SMASZCZ, Plaintiff in Error.

*Opinion filed June 18, 1931.*

THADDEUS C. TOUDOR, and NELSON OSNOSS, for plaintiff in error.

. OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

An indictment was returned in the criminal court of Cook county against the plaintiff in error which charged him with unlawfully making an assault upon Nora Moriarty with an automobile which he was unlawfully and negligently running and operating upon a public street of the city of Chicago and with striking and running over her with the automobile and giving to her divers mortal wounds, of which she died. He was convicted of manslaughter and sentenced to imprisonment in the penitentiary and has sued out a writ of error.

Plaintiff in error contends that the evidence does not sustain the verdict, that incompetent evidence was admitted, and that the State's attorney made improper and prejudicial remarks in his argument.

The homicide is admitted, counsel for the plaintiff in error stating in their brief that the evidence showed that Nora Moriarty was hit by an automobile on December 8, 1929, at the corner of Eighty-sixth street and Stony Island avenue, in Chicago, and died in consequence of the injury,

and that Patrick Moriarty, the husband of the deceased, established the *corpus delicti* and identified the State's exhibit 2 as his wife's hat. The evidence further shows that on Sunday evening, December 8, 1929, Mrs. Moriarty left her home, at 1527 East Eighty-fifth place, about 7:45 o'clock, with her sister-in-law, Mrs. O'Donnell, and Mrs. May Healy, all starting to church at Ninety-third street and Blackstone avenue. Ninety-third street and Eighty-sixth street are south and Blackstone avenue is west of 1527 East Eighty-fifth place, which is about 200 feet west of Stony Island avenue and about the center of the block from Stony Island avenue to Blackstone avenue. On the southwest corner of Stony Island avenue and Eighty-sixth street, the first street south of Eighty-fifth place, was a filling station, with a driveway running diagonally from Stony Island avenue to Eighty-sixth street and a building fronting on this driveway. David Nelson, the filling station attendant, on that Sunday evening was standing at a desk inside the station, between the door and the window, reading a paper, when he heard a crash. Looking out of the window near which he was standing he had a view diagonally across the street and saw a car "jerking along." Stony Island avenue is a double-drive street, and the car was directly east of the southwest corner of Eighty-sixth street and Stony Island avenue, on the east side of the west driveway, and going south. The witnesses in their testimony referred to a plat which was before the jury but is not in the record, and its absence makes it difficult to follow the testimony with its frequent references to the plat. It does appear, however, that except the corner occupied by the filling station the property at the intersection was vacant. There were several lights at the filling station and a street light at the corner, which was well lighted. The pavement was dry and there was no ice on it. When he looked out and saw the car "jerking along," Nelson went out the door and across the sidewalk and saw the car, which was a tan-colored

Studebaker sedan, passing the driveway of the filling station and gaining speed. He saw some bodies lying in the street—one lying parallel with the curb and another sort of crosswise. He tried to get the license number but could not, and he hailed the driver of a Ford car which came along just then and asked him to get the license number of the Studebaker, which was then about 150 feet south. There was not light enough for him to see whether there was anyone else in the car except the driver or to identify the driver. There were no other automobiles on the street at the time. Nelson stepped over to the bodies lying on the street there, to protect them from probably getting run over by other cars. People began to gather there—twenty-five or thirty, perhaps more. Nelson assisted in putting the two bodies in an automobile and they were taken away before the arrival of the police. The patrol arrived a few minutes after the bodies were taken away. The man in the Ford car was Frank Nielsen. He got the license number of the Studebaker and came back and gave it to Nelson, who gave it to the police.

Frank Nielsen, the driver of the Ford car, was driving south on Stony Island avenue. As he approached Eighty-sixth street there was probably another car or two on the street. As he crossed Eighty-sixth street he did not see anything take place but he saw a pile on the street that he could not make out. His testimony then appears in the abstract as follows: "That pile was on the southeast side of the street [indicating on the plat]. This is the parkway here. I saw some glass thrown over this way and I moved over this way to miss it. Mr. Nelson (I found out his name later) told me to get the number of the car ahead. There may have been some cars in the block or two ahead of me at the time. I only saw one car. I followed that car. That car was about 100 or 150 feet south of me. I started right out after that car. I proceeded after this car. I got the license number." He did not notice the color or make of

the car. As he was giving chase the car appeared to be stopped. As he went after it he blew the horn and the car was speeded up, "so I stepped on it and took the number." It took him about one and a half minutes to get the number. He wrote it down, went back to the scene of the accident, gave it to the station attendant, and was there when the police arrived. There were two bodies, and a third person was taken to the hospital.

Mrs. Moriarty's husband saw her leave the house with Mrs. O'Donnell and Mrs. Healy for the church and about an hour later saw her dead body at Jackson Park Hospital. She had suffered a crushing injury to the left side of the chest, a fracture of the left leg, severe bruises and abrasions to the body and a scalp laceration.

Thomas Cammack, a police officer, was called to the scene of the accident and arrived soon after it occurred. He testified that he found glass from a headlight lying out six or seven feet from the curb, on the northwest corner. He examined the street. There were blood spots around that corner where the bodies had been picked up, a shoe or an oxford slipper belonging to a lady. The glass began just on a line with the sidewalk from the west point extending to the center of the street. It was about fifteen feet from where the glass began to where it ended. It was about forty-four or forty-five feet from the point where the glass began to where he found the blood. The glass was spread from a point about six or seven feet from the curb, in line with the sidewalk, which is the north side of Eighty-sixth street, to about the center of the intersection. It was glass that was used in lights. There was enough to pick up to show it was glass used in automobiles. The intersection was well lighted. One light belonged to the city, five around the corner belonged to the oil station, six of these, and eighteen around the corner.

Edward J. Powers, another police officer, was also called to the scene of the accident and arrived soon after it oc-

curred. He was given the license number of the car and returned to the station to see to whom it was issued. In doing so he went south on Stony Island avenue, turned west on Eighty-third street to Von avenue, and there found a reflector from the headlight of an automobile lying on the street, which he took to the station. Afterward he saw the defendant's car at the Burnside station—a Studebaker sedan. The glass was out of the right headlight. The reflector was knocked out of the frame. Powers took the headlight off of that car. The light was turned "in this position." It was out of the frame on the next day, December 9. State's exhibit 7 is the cross-bar that was holding this lamp across. Another bar was held to the other light, was broken off, and Powers found it. The car was of tan color, with a light tan stripe around it. Powers fitted the reflector that he found in the street into the headlight. There was a dent in the reflector similar to the one in the lamp. The spot on Von avenue where the reflector was found was about a mile and a quarter or a mile and a half from the intersection of Eighty-sixth street and Stony Island avenue. Powers took the headlight off the car and removed the bar also. He unscrewed it from the car. The lamp was taken off the right side of the automobile.

Leroy Carrier, another police officer, reported at the station at 11:30 of the night of December 8 and received instructions. He testified that he went to 606 South Francisco street, the home of the defendant, and arrived at the home about 12:30 with another officer, relieving two who were there. The two remained there until 2:00 o'clock A. M. The defendant was not there but arrived at about 2:05. He had backed up his car in the alley, intending to put it in the garage, and had just got out of the car and was trying to open the garage door when Carrier stopped him and asked his name. He looked at the officer in a queer way and said, "What is it to you?" Carrier then told him that he arrested him for running away from the scene of

an accident. The defendant said, "Wait a minute until I put my car in the garage," but Carrier said, "No, we want the car with you." They walked out into the alley and Carrier turned him over to the other officer. They looked his car over on all sides, examining the left side first. There was a spare wheel on that side, and there he found a tan hat and a brown comb. It was a wire wheel and he found the hat stuck in the spokes. He did not ask the defendant about the hat. This was the People's exhibit 2, which Patrick Moriarty identified as his wife's hat. The left front of the fender was badly damaged. The right headlight was dented, the reflector was missing and the bar that holds the two headlights was broken. Carrier asked the defendant if he could recall the time his headlight and fender were smashed, and he said he did not know. Then Carrier put the defendant in his car and drove to the station. He said nothing. Carrier tried to have him recall when he had been on the South side that evening, but his answer was "No."

Officer Cammack saw the defendant between eight and nine the next morning at the Burnside station and testified: "I tried to see if he would do a little talking. I wanted to find out how the car got smashed up. I said to him, 'Who was with you?' He gave me a certain name. I do not remember the name and I could not tell where the man lived. He said he had been with him all day out in Cicero. I asked if he was driving the car or if anyone had it but himself. I asked him if he had been over in that district, and he said no. I asked him about the hat found on the side of his car. I asked him if he could tell about it. He said he could not. I did not ask him how the hat got there. The right headlight was broken and the cross-bar. The reflector was missing. We examined the reflector and fitted it into the light still on the car."

The questions of fact arising out of the evidence are the identity of the plaintiff in error as the driver of the automobile and the sufficiency of the evidence to show that

the negligent driving of the car was the proximate cause of Mrs. Moriarty's death. The evidence justifies the jury's conclusion that the plaintiff in error was the driver of the automobile. The automobile, whether tan-colored or olive brown, bearing license No. 609,874, issued to the plaintiff in error, was the car which struck the women. It was found later in the possession of the owner when he returned to his home after having been away with the car all afternoon from two o'clock and all night until two o'clock in the morning. The time from six o'clock to nine he spent at his friend's house at 3002 West Fifty-fourth street. He drove there in his car, got there about six and stayed there until nine. It was during this time that the car ran into and killed Mrs. Moriarty. Somebody drove it. The plaintiff in error testified that he did not and nobody else did with his permission, but at nine o'clock he found the car where he had left it parked and drove to his sister's and later to the other places he mentioned. It hardly seems credible that a stranger took the car without permission and after having driven it to Eighty-sixth street and Stony Island avenue and had the collision there, carefully returned it to the place from which he took it, and that the plaintiff in error found it there at nine o'clock, when he left his friend's to go to his sister's, but did not discover any change in it.

The question whether a defendant charged with manslaughter by the negligent driving of an automobile is guilty of criminal negligence which was the proximate cause of the death is a question of fact for the jury to pass on under correct instruction by the court. (*People* v. *Falkovitch,* 280 Ill. 321; *People* v. *Adams,* 289 id. 339.) The jury might justifiably find from the evidence, beyond a reasonable doubt, that Mrs. Moriarty was killed by being struck by an automobile driven by the plaintiff in error on a well lighted street intersection in the city of Chicago at a rate of speed much greater than was reasonable and proper, having regard to the traffic and use of the way, and so as to

endanger the life or limb of persons using the street, in willful disregard of the danger to human life. The force of the collision and the speed of the car are indicated by the testimony of Nelson that when he heard the crash it sounded like two automobiles coming together. The collision was not of two automobiles coming together but was of an automobile with human flesh—the bodies of the three women. The automobile itself bore evidence of the force of the collision, and consequently of the speed of the automobile. The right headlight was dented, its glass broken, the reflector dropped out, the metal rod between the headlights was broken and the left fender was badly damaged. The broken bar and dented metal showed the force was extreme, particularly when it is considered that the collision was not of metal with metal but of metal with human flesh, and that the bodies of the three women were thrown or dragged forty-five feet from where they were struck. Moreover, the fact that the car, when Nelson saw it, was "jerking along" was evidence that the brakes had been applied and were not holding evenly but checking the momentum of the car. Still the car ran forty-four or forty-five feet before it was stopped. The jurors were authorized, in the consideration of the evidence, to take into consideration their own common knowledge and observation in the affairs of life, and it was their province to determine from a consideration of all the evidence whether the car was driven at such a speed as to show an utter disregard of the rights of persons using the street. This was a question of fact for the jury under proper instruction. (*People* v. *Toohey*, 319 Ill. 113.) The flight of the plaintiff in error from the scene of the collision without any effort to ascertain the extent of the injuries caused by his act or to help the injured persons may also be taken into consideration as evidence of guilt. (*People* v. *Schwartz*, 298 Ill. 218.) Under the evidence we cannot hold that the verdict was not authorized by the evidence.

No complaint is made of the instructions. They do not appear in the bill of exceptions. There is complaint of the argument to the jury of the assistant State's attorney who tried the case, but we have not found that he exceeded the legitimate bounds of fair argument.

The judgment is affirmed. *Judgment affirmed.*