(No. 22949
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEROY D. OLIFF, Plaintiff in Error.

*Opinion filed June 14, 1935—Rehearing denied October 9, 1935.*

MARTIN O. WEISBROD, SAMUEL A. HOFFMAN, and HARRY J. BUSCH, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, HENRY E. SEYFARTH, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE HERRICK delivered the opinion of the court:

LeRoy D. Oliff was indicted in the criminal court of Cook county for the crime of arson. He was tried by a jury, found guilty and sentenced to the penitentiary. By this writ of error he seeks a reversal of the judgment.

The indictment consisted of eight counts. *Nolle prosequis* were entered as to the first four counts. The last four charged that the defendant and Jack Brown (otherwise called Jack Nasanov) did set fire to (fifth count); did burn (sixth count); did cause to be burned (seventh count); and did aid, counsel and procure to be burned (eighth count) a certain dwelling house, to-wit, rooming house situated in a two-story-and-basement brick building commonly known as 24 North Halsted street, in Chicago, the building being the property of LeRoy D. Oliff.

The structure in which the fire occurred and as established by the evidence conforms to that described at the street number mentioned in the indictment. There was a combined new and second-hand clothing business conducted on the first floor and the second floor was used as a rooming house. The front entrance to the store was by a door in the center, with display windows on either side, and separated from the main part of the store by a wooden partition. Clothing hung on racks in the center of the store, and the rear fourteen feet thereof was partitioned off as a workshop for tailoring work. The front door was locked by an ordinary lock in the door with a key, and a wire-mesh door was placed at the front at night. A padlock secured the rear door. The persons conducting the business were the defendant as proprietor, a clerk and the tailor. On the night of December 11, 1930, several companies of the fire department responded to an alarm at about 10:34 o'clock. One company reached the fire in two or three minutes. Fire was discovered coming from the front of the store and glass from the front windows was on the sidewalk. There was a small door in the partition between the display section and the store proper and a flame was coming through this small door. A fire truck company opened the locked front door. The body of the fire was extinguished in about ten minutes' time. The suits of clothes on the racks in the center of the store were burned across the shoulders and arms, all in the same manner, the backs or under-part of the garments appearing to be untouched by the fire. The ceilings, partitions, side walls and floor were charred and scorched. Because of the characteristics of the fire the captain of the fire department testified that it was a flash-fire, or one not of natural origin. A man leaning over a bench and groaning was discovered in the workshop of the store by the firemen, but he fell to the floor before he was removed. He was taken to the County Hospital. He made no statement at the place of

the fire, but at the hospital gave his name, occupation and partial information concerning the license number of his automobile. He stated that he had gone to the alley near the premises to answer a call of nature, but he did not know what happened after that time and gave no explanation of why he was in the store building. The license number of the automobile, which stood on Green street, a block west of the premises in question, was checked with the person to whom it was issued, and it was found his name was Lionel J. Nasanov, which was not the same name the police officer understood at the hospital but was very similar in sound. A navy-blue pea-jacket was found on the bench where Nasanov was first seen and was identified by Robert Nasanov, a brother, who saw Lionel's body at the county morgue. A bunch of keys and a padlock were found near the place Nasanov fell from the bench. Nasanov's death was attributed to the burns received in the store of the defendant.

Jack Nasanov, (sometimes known as Jack Brown,) another brother of Lionel Nasanov, testified that in December, 1930, he and his brother Lionel agreed with the defendant to set a fire in his store. They were to receive $500 and a fur coat. The witness told the defendant when he would bring the gasoline and papers. He thereafter went in Lionel's automobile to the store with twenty-five or thirty pounds of paper and three gallons of gasoline. He first went inside and asked the defendant if it was all right to bring the material inside. A man was present, and the defendant said it would be all right in a few minutes. Jack and Lionel went out and brought in the gasoline and papers, which were placed in a trunk in the rear room and the defendant locked the trunk. The witness was to lay the paper in the store, pour gasoline on it, and with the use of a wick which he had obtained from his mother-in-law the fire would ignite. The wick was placed in a cigar box and left behind a counter in the store. The

date set for the fire was the following Thursday or the date it occurred, December 11, 1930. He was to make his exit through a small window in the rear of the store. The witness was taken sick on the following Wednesday and went to a hospital, where he remained three or four days. He saw neither his brother Lionel nor the defendant after he entered the hospital but upon leaving the hospital learned of his brother's death. On cross-examination the witness admitted that he was arrested about six months previous to the trial here while in the act of setting fire to a building, and he thereafter made a confession implicating the defendant in the crime here charged.

Bertha Warshavsky testified that Jack Nasanov (or Jack Brown) was her son-in-law. She made a large wick which was designed to hang from strings, and matches were placed in it in contact with cotton, in such a position that after the wick had burned for from three to five minutes the matches would ignite the cotton and the material ignited would fall to the floor in the gasoline and cause a fire. She admitted on cross-examination that she had made wicks before and that she was known as the arson queen. The defendant had signed her bond in a case wherein she had been indicted.

A witness (Sam Stoll) had a place of business next door south. He resided in the rear and conducted a shoe store in the front. He testified that the defendant saw him about three weeks previous to the fire and asked permission to leave four mink coats in the rear, where the witness lived, stating that he was afraid the defendant's store might be broken into and the coats stolen. Because the defendant was his landlord the witness consented, and the defendant brought the coats in and hung them up in a closet. Various persons thereafter called to see the coats while they were in his custody. After the fire he gave them back to the defendant.

When the defendant was asked by a representative of the National Board of Underwriters for the keys to his store the morning following the fire he fumbled in his pockets and then said he did not have them—that he might have left them at home. · The contents of the store were insured for $12,000, and the defendant collected $3000. The expiration dates of the insurance policies were, three in January, six in March and one in April, 1931.

The defendant, forty-five years of age, testified that he owned the building in question and had in his store about the first part of December, 1930, $13,000 or $14,000 worth of merchandise, which did not include the four fur coats heretofore mentioned; that he carried the insurance mentioned, and that after the fire he and an insurance representative by the name of Nielson agreed that the value of his merchandise was about $13,000. He testified that he was indebted in the sum of only about $385 on his entire stock of goods. He denied that he agreed with anyone to burn his store or its contents. He stated that he did not know Jack or Lionel Nasanov, and that the latter had no right to be in his store on the night of the fire. He employed a clerk and a tailor, and the latter worked in the rear part of the store. He had a set of keys for the front door and his clerk had one set, but the defendant had no keys to the rear. The tailor had one set for that entrance. The clerk opened the store in the morning and closed it at night. The rear of the store was locked from the inside by a padlock and was kept closed except in the summer. No one brought gasoline into the store for the purpose of setting a fire. At about 11 :00 o'clock on the night of the fire the watchman who was employed to protect buildings in the neighborhood, including his store, called him on the telephone and told him of the fire. He lived several blocks farther west, on the west side of Chicago. He immediately took a taxicab to the store. When he arrived he saw the fire and was thereafter questioned by the fire captain

about the insurance he carried. He was informed that a man was found in the place, and the defendant was taken to the police station. In September, 1934, near the time of Jack Nasanov's arrest, the defendant was arrested and taken to the office of the State's attorney and was questioned about the fire and about Jack Brown, or Jack Nasanov. He admitted signing bonds at the request of professional bondsmen. He stated that he did not know Bertha Warshavsky, but he did not remember the names of all individuals for whom he signed bonds. His explanation of the reason for leaving the fur coats with the shoe merchant next door was that a furrier named Sam Brauer, who afterward committed suicide, left the coats with him as security for money he borrowed of the defendant. The defendant sold two of the coats to the wife and daughter of the man with whom he left the coats for safe keeping and the other two to the partner of the man who left them with him for security. He previously had been a victim of hold-ups, and that caused his fear of robbery. It was shown on cross-examination that he had collected $7000 for a theft of diamonds, and for another robbery in his home of $245 in money he collected $50.

In rebuttal, E. A. Nielson, presumably the same man mentioned in the defendant's testimony, testified that he represented a merchandizing enterprise owned by insurance companies engaged in salvaging insured goods; that he made an appraisal of the defendant's stock after the fire and found that the sound value of the goods remaining therein after the fire was $7945.22; that the defendant had given him the cost of the goods as $11,505.63, but that some bills were not produced because it was stated they were lost in the fire.

The errors relied on for a reversal of the judgment are, that the evidence was insufficient to warrant a finding of guilty because (a) there was no proof that the building in question was a dwelling house; (b) the charring and

scorching of the building shown in evidence did not constitute a burning within the legal meaning of that term; (c) the evidence was not sufficient to connect the defendant with the crime charged beyond a reasonable doubt; (d) improper and prejudicial evidence was admitted; and (e) the argument of the assistant State's attorney deprived the defendant of a fair trial.

The contention that there is no proof of the burning of a dwelling house cannot be sustained. The defendant testified that in December, 1930, he owned the building, on the first floor of which he conducted a clothing store and the second floor of which was leased. It was stipulated that the first floor was so used and that the second floor was occupied by a man who conducted a rooming house. A dwelling house may be differently understood, depending upon the sense in which it is used. (*Robbins* v. *Bangor Railway and Electric Co.* 100 Me. 496, 62 Atl. 136; *Corey* v. *Schuster,* 44 Neb. 269, 62 N. W. 470; 19 Corpus Juris, 843.) A rooming house may be the only dwelling house the occupants thereof possess. It is their habitation. There is nothing in the statute requiring dwelling houses to be for single-family dwelling purposes only, or that they be any other limited type of dwelling. A building may be a structure used partly for business and partly for residence and be considered a dwelling house. (*State* v. *Rudman,* 327 Mo. 260, 37 S. W. (2d) 409; *People* v. *Horrigan,* 68 Mich. 491, 36 N. W. 236.) That the definition in the statute of the offense of arson was not intended to be of a technical and circumscribed character is indicated by the use of the words, "the burning of any dwelling house, or any kitchen, shop, barn, stable or other outhouse that is a parcel thereof, or belonging to, or adjoining thereto." Cahill's Stat. 1933, chap. 38, par. 25, p. 990; Smith's Stat. 1933, par. 48, p. 1006.

It is contended that the charred and scorched condition was not sufficient to constitute a burning sufficient to prove

arson. There must be a wasting of the fibers of the wood, no matter how small in extent, to constitute a burning. The charring of a wall or floor is sufficient. (*People* v. *Haggerty,* 26 Cal. 354; *People* v. *Simpson,* 50 id. 304; *State* v. *Sandy,* 25 N. C. 570; *State* v. *Rogers,* 168 id. 112, 83 S. E. 161; *Kehoe* v. *Commonwealth,* 149 Ky. 400, 149 S. W. 818; 2 Bishop on Crim. Law, (9th ed.) sec. 10, par. 3; 2 Wharton on Crim. Law, (12th ed.) pp. 1343, 1344.) The floor, ceiling and partition were charred and the partition had to be torn down. There was a wasting of the wood fiber disclosed in this condition. There was a blaze of fire which required the fire department about ten minutes to extinguish. It is not necessary to determine whether the blaze came from the clothing or the building. The proof of a burning of the building was sufficient.

The evidence tending to connect the defendant with the crime was sufficient to justify the jury in reaching the verdict it did. The testimony of Jack Nasanov, although he was an accomplice, was direct and in considerable detail, coinciding with other facts and circumstances in evidence. No complaint is made that the jury was not amply and correctly instructed upon the subject of the testimony of an accomplice and the manner in which his evidence should be considered, scrutinized, weighed and acted upon. A conviction will be sustained, even on the uncorroborated testimony of an accomplice, if the evidence as a whole is sufficient to prove the guilt of the defendant beyond a reasonable doubt. (*People* v. *DeRose,* 359 Ill. 512.) The brother of the man who confessed was found in the place while the fire was burning. His presence in the building was unexplained but was consistent with his brother's testimony. The mother-in-law of the man who confessed testified to making the wick, and her testimony was in harmony with that of the accomplice. The fire was not of natural origin. Valuable furs were not permitted to be exposed to the danger of a fire as well as robbery. The

property was insured, some of the policies expiring the following month, six in three months and one in four months. It was the province of the jury to determine the guilt or innocence of the defendant. On the question of fact the court will not disturb the verdict of a jury unless it can say from all the evidence the defendant's guilt was not proven beyond a reasonable doubt. *People* v. *Abelsky,* 359 Ill. 387; *People* v. *Fitzpatrick,* 359 id. 363; *People* v. *Wynekoop,* 359 id. 124.

Certain testimony on the re-direct examination of Bertha Warshavsky, it is contended, was incompetent and prejudicial. She had stated on cross-examination that she had made the wick for Jack Brown. The defendant's counsel asked, "You made a lot of wicks, didn't you?" to which she replied in the affirmative. She was then asked, "You made them over a period of a good many years?" and she again replied in the affirmative. She was then asked, "You are known as the arson queen, aren't you?" and she replied, "Yes, sir." On re-direct examination she was asked if one of the fires for which she was indicted was not the Casselli fire, to which an objection was interposed, and she was permitted to answer. She was then asked if the defendant signed her bond, and she answered that he did. It was objected that these questions were not proper re-direct examination, but the trial court ruled that when the door was opened by the defense to show her activities in the manner stated, the re-direct examination with respect to particular fires was proper, and the objection was overruled. For the reason stated by the trial judge there was no error in admitting the evidence to which objection was made.

During the argument of one of the assistant State's attorneys he stated to the jury: "This is your first case. As you proceed through your term, you will learn that there are some things that men can stand up before you and say, and not mean it. You may not get it in the first

case, but before you finish your services here in the building, you will see what I mean." The statement was objected to and the objection sustained. It was susceptible of conveying to the jury the impression that practices were indulged in jury trials which they were to understand were not sincere and was the more insidious because it was indefinite. The statement was improper. One of the counsel for the defendant had previously in his argument to the jury stated: "You [the jury] came here to enforce the law, and I want you to enforce the law. I am for law enforcement just as much as you are; and I think I have demonstrated it to this county by my service to the county heretofore." There was nothing in the record with respect to the attorney's former service for the county and it had no application to the issue. It was proper for the assistant State's attorney to comment upon the remarks made, but when he addressed the jury he stated: "Counsel stands up here and says to you that he is for law enforcement. Well, if he was so strongly in favor of law enforcement as indicated by the tone of his voice, you would find that the type of men that he is defending in this building would not retain him for their lawyer." An objection was made and sustained, and the jury was instructed to disregard that line of argument because it was improper and prejudicial. The trial court's statement properly characterized the argument. There was no justification for the making of such statement. In view of the character of the evidence and the fact that the trial judge promptly sustained the objections to the two statements we do not believe the remarks require a reversal of the judgment. (*People* v. *Fitzpatrick, supra; People* v. *Wynekoop, supra,* p. 137; *People* v. *Hunter,* 329 Ill. 186; *People* v. *Barnard,* 327 id. 305.) We find no reversible error in the record.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*