(No. 24057.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN C. ALLEN, Plaintiff in Error.

*Opinion filed October 22, 1937—Rehearing denied April 20, 1938.*

STONE and SHAW, JJ., dissenting.

HOPKINS, STARR & GODMAN, (JAMES A. SPROWL, CHARLES M. McDONNELL, WILLIAM R. EMERY, and GEORGE E. McMURRAY, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and BLAIR VARNES, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, John C. Allen, was indicted in the criminal court of Cook county for the involuntary manslaughter of Charles B. Klafter with an automobile. A jury found him guilty. Following denials of motions for a new trial, in arrest of judgment and for probation, the defendant was sentenced to imprisonment in the penitentiary for an indeterminate period of from one to fourteen years. He prosecutes this writ of error.

On the evening of Saturday, February 16, 1935, at about 9:15, defendant was driving his automobile, a 1933 Ford V-8 sedan, north on Dearborn street, in Chicago. Accompanying him was Betty Spence, an unemployed waitress whom he had met at the home of mutual friends where they were both dinner guests. Before dinner defendant and the young woman had two small highballs mixed by their host. They departed about 9:00 P. M. and at her request defendant drove to the "Loop" but did not stop, and proceeded north on Dearborn street. His automobile appears to have been in good mechanical condition and equipped with efficient brakes which he said he applied on the way down town to demonstrate their effectiveness. Approaching the intersection of Dearborn and Erie streets defendant's car was preceded by another automobile, a Chrysler coupe, traveling in the same direction, ahead of and immediately to the right. Homer Anderson was driving this car, and his wife, Betty Anderson, was with him. As these two cars approached the south cross-walk of Dearborn and Erie streets three men, Ray Duran, Charles B. Klafter and Hollis Mather were walking abreast across Dearborn street from east to west. Anderson slowed his car down when he saw them. The men passed his car into the path of defendant's automobile, and all three were struck by it. Their bodies were carried north by defendant's car, one man being found a little north of the middle of the intersection, the second at the north cross-walk, and the

third, eight or ten feet farther north. Duran and Klafter died as the result of the collision and Mather sustained serious injuries. After the crash defendant's car swerved slightly. He did not stop his automobile, but continued north for three blocks to Chicago avenue, and turned east on that street. Anderson pursued defendant's car to the point where it was brought to a stop on Chicago avenue between Dearborn street and State street, the next north and south street. Mrs. Anderson summoned the police, who, upon arrival fifteen to twenty minutes later, placed defendant under arrest.

At the point where the collision occurred Dearborn street is a wide thoroughfare sixty feet wide from curb line to curb line. Erie street, the intersecting east and west street, is forty feet wide. A distinctive black line ran through the center of Dearborn street dividing the north and south lanes of traffic. The street was adequately lighted and on the night of February 16, 1935, dry and in good condition. Cars parked along both the east and west curbs of Dearborn street partly obstructed the view.

Mather resided on Erie street near the scene of the accident. He testified that, after hesitating at the southeast corner of Dearborn and Erie streets, he and his friends proceeded across Dearborn street from east to west about five feet south of the curb line of Erie street, he, the witness, being in the middle, Duran to his left and Klafter to his right; that they were engaged in conversation as they hurried across the street, almost on a run; that he noticed no traffic from the north, but saw a coupe coming slowly about one hundred feet to the south; that after passing the center line of the street he saw a second car pull out from behind the coupe, advancing at a terrific rate of speed; that when he first saw defendant's car it was seventy-five or eighty feet away, and at least five feet west of the center line of Dearborn street; that he and his companions were then directly in front of the second

car; that he stopped, put out his hand and touched Duran, who jumped toward the west curb; that when defendant's car struck Duran, the latter was only two feet from the west curb of Dearborn street; that he, himself, was hit instantly and did not know what happened afterwards; that at the time Duran jumped, and when the car struck him (Mather) he was about eight feet from the west curb line of Dearborn street. According to the witness the left portion of the defendant's automobile struck Duran and the right side struck him—the car coming between them.

From Anderson's testimony it appears that just prior to the accident he was traveling at a speed of about thirty-five or forty miles per hour; that thirty or forty feet south of the intersection he observed Mather, Klafter and Duran, practically at the center of Dearborn street, walking at an ordinary gait; that a roar described as a "swish" or "swush" attracted his attention as defendant's car shot by him and crashed into the three men who were then five to eight feet west of the center line of Dearborn street; that judging by the "terrible roar" and the way defendant's car rushed by it must have been going at least sixty miles an hour; that the left-hand side of his own (Anderson's) car was three or four feet east of the center line and at the moment of impact, according to his estimate, from twenty to thirty feet south of the building line on the south side of Erie street; that although he promptly shifted into second gear to accelerate his speed and started sounding his horn as he continued north in pursuit of defendant's car the latter out-distanced him; that at Chicago avenue defendant swerved through a red traffic light to the right, but that he followed through and forced defendant to a stop at an alley around the corner. Anderson added that defendant, in answer to his query as to why he had driven on from the scene of the accident, replied that he was looking for a place to park; that defendant's companion said, "Go on, drive on, pay no attention to this punk;" that defendant made no

move and said nothing further; that the horn of defendant's car was continually sounding, and that he, the witness, pulled the wire on the horn to silence it.

Betty Anderson corroborated her husband's testimony. In particular, she said the pedestrians, when struck, were just a little to the west of the center of the street, and that she and her husband were in the second lane of north bound traffic as cars were parked in the first lane. Mrs. Anderson testified that after the collision the first man was approximately in the middle of the street intersection, and that one of the others was a little east of the center of Dearborn street.

Charles W. Hardy, a former neighbor of Mather's, together with his wife and sister-in-law, was walking north on the east side of Dearborn street between Kinzie and Illinois streets, four and one-half blocks south of the corner of Dearborn and Erie streets, at about 9:15 on the night of the accident. According to Hardy's testimony it appears that a continuous stream of traffic was driving north; that he noticed a mud-spattered Ford sedan, without a tail light, headed north in the middle of the street at the rate of between fifty and fifty-five miles an hour; that after proceeding about one-half block he heard the impact and hurried to the scene of the collision where he saw the bodies of the men struck by defendant's automobile. Hardy placed the bodies in about the center of Dearborn street, the first in the middle of the thoroughfare about forty feet north of the south curb line of Erie street; the second about forty-eight feet from the south curb line, or six or eight feet north of the first, both of these first two bodies being a little to the west of the center line of Dearborn street, and the third about fifty-two feet from the south curb line, and farther to the east, and that two bodies were nineteen, and one twenty-one, feet east of the west curb, respectively. The witness testified further that he later saw the same mud-spattered car, identified as defendant's automobile, at the Chicago avenue police station.

Irving O. Lintner, a funeral director, testified that he was driving east on Chicago avenue at the time of the crash; that the "go" lights were on for east and west traffic and that as he approached the intersection of Chicago avenue and Dearborn street there was an automobile coming north on Dearborn street with a horn blowing; that he had to turn south to avert a collision with defendant's car; that both defendant's and Anderson's cars went through the red light on Dearborn street. On cross-examination he added that defendant's car was traveling twenty-five or thirty miles an hour. Lintner placed the bodies in approximately the same position as Hardy.

The defendant, a manufacturer of automobile accessories, came to Chicago from Mississippi in 1931. At the time of the trial he was forty-six years of age and unmarried. He testified that just before the collision he was driving at a speed of about twenty-five or thirty miles per hour; that the car in front of him to his right was traveling at about the same speed, although he, defendant, might have been driving a fraction faster than the other car; that both cars were in the north bound lanes of traffic; that at Erie street he saw no pedestrians, could see no cars coming from the west and had started across the intersection when suddenly the car ahead slowed, practically stopped, and, without warning, three men jumped directly in front of his automobile "as though they might have come up from the ground." Defendant stated that when he first saw them they were about ten feet from him, and that he struck them instantly before he could apply his brakes. At no time, defendant asserted, did he drive in the south bound traffic lane west of the center line of Dearborn street. He maintained that his left wheels were possibly two feet east of the center. To explain his failure to stop the car, defendant testified further that he was shocked and stunned at the time of the crash, and did not know what happened thereafter, until he reached Chicago avenue; that he pulled

around the corner and stopped his car, shut off the motor and turned out the lights; that he got out to stop the blowing of one of the horns; that afterwards a man appeared in the middle of the street car tracks and informed him he had struck someone; that he then got back in his car, unable to speak about it.

Betty Spence, at the time of the trial, was absent from the jurisdiction of the court. Her statement made at the coroner's inquest was read to the jury. She asserted that defendant's car never crossed the center line of Dearborn street. The statement discloses that she noticed the three men when they were standing at the south cross-walk just off the east curb of Dearborn street; that defendant was then approximately thirty feet, or farther, south of this walk; that at the time of the accident she knew defendant was driving thirty-two miles per hour because she had happened to look at the speedometer several times; that she looked back after the impact and saw three bodies, but did not, however, observe Anderson's car in pursuit; that after the collision defendant moderated his speed to eighteen or twenty miles per hour, and just "crept along" to Chicago avenue. She testified further that the crash occurred so suddenly she did not remember just what was said by defendant and herself, although she did ask him why he did not stop, but that he did not reply. At Chicago avenue, she continued, defendant said something about stopping at the first parking place. According to her statement there was no available parking space on the east side of Dearborn street from Erie street to Chicago avenue. She denied that defendant went through a red light on Chicago avenue.

Anthony King, a witness for defendant, was driving north in the vicinity of Dearborn and Erie streets when the crash occurred. He was not, however, an occurrence witness. He testified that the three bodies were directly in a row down the center of Dearborn street, the first a little

north of the center of Dearborn and Erie streets, the second body on the center line of Dearborn street at the north cross-walk, and the third, eight or ten feet farther north.

Earl Mudd, service manager for a Ford dealer, checked defendant's car at the latter's request, and found the left lens broken and the light bent, the radiator grill caved in, one headlight bent and broken, the hood smashed on top, and the left fender dented. The car had two horns.

Three witnesses, a lawyer who had represented defendant in other matters, a former United States senator from Mississippi, and an automobile dealer, testified to his good reputation as a law-abiding citizen.

Prior to the trial defendant filed a petition for discharge. The petition alleged that he had been previously discharged by the court under an indictment charging him with the involuntary manslaughter of Ray Duran; that the earlier indictment was returned during the May, 1935, term of the criminal court; that on August 14, 1935, the indictment was stricken on motion of the State's attorney, with leave to re-instate; that he, defendant, demanded trial in that cause in writing on August 15, 1935, again on September 17, October 18, and November 29, 1935, and that on May 7, 1936, he was discharged by the court from said cause; that the matters in the two causes of action against him arose out of the same set of facts and out of the same collision; that, in particular, the same act or cause of injury affected both Duran and Klafter, and, in consequence, that his discharge on May 7, 1936, growing out of the same act or cause of injury as that charged in the present indictment for the manslaughter of Klafter, placed him in jeopardy. The petition for discharge for double jeopardy was overruled. This ruling, defendant strenuously insists, was erroneous. The petition for discharge was overruled strictly as a matter of law. No issue of fact was made with respect to the allegations of defendant's petition and no evidence was heard with respect thereto. The propriety

of the disposition of the legal question presented was properly preserved for review. The order to strike, with leave to re-instate, implied that the cause was still subject to the action of the trial court. (*People* v. *Kidd*, 357 Ill. 133.) That court, in the *Duran case*, had jurisdiction of the defendant, Allen, and of the subject matter. The order of discharge cannot, therefore, be collaterally attacked by the People in this case.

It may be conceded, as defendant contends, that a discharge under section 18 of division 13 of the Criminal Code, (Smith-Hurd Stat. 1935, p. 1237,) because not tried within four months after written demand, renders an accused immune from trial for "the same offense" whether under the same or a new indictment. (*Nagel* v. *People*, 229 Ill. 598; *People* v. *Heider*, 225 id. 347; *Newlin* v. *People*, 221 id. 166; *Brooks* v. *People*, 88 id. 327.) In *Newlin* v. *People, supra,* this court expressly held that where a defendant, indicted and committed for crime, is entitled, under the statute, to a discharge for delay in not bringing him to trial while being held under the indictment, the fact that a second indictment is found for the same offense and a *nolle prosequi* entered as to the first indictment, does not defeat his right to be discharged. Again, in *People* v. *Heider, supra,* the court held that an accused, committed for crime, who has obtained his discharge owing to the failure of the People to bring his case to trial within the time prescribed by the statute enacted to carry into effect the constitutional guaranty of the right to a speedy trial, cannot be committed or held for the same offense under a new indictment. In short, defendant's discharge on May 7, 1936, necessarily rendered him immune from trial under the same or a new indictment charging him with the involuntary manslaughter of Ray Duran. The discharge was a bar to another trial on the first charge. It does not follow, however, that the discharge prevented the People from returning another indictment charging defendant with

the involuntary manslaughter of Charles Klafter, a different person from Ray Duran. The determination of that issue requires preliminary consideration.

Defendant earnestly contends that the indictment for the manslaughter of Klafter was for the same offense as the prior indictment for the manslaughter of Duran. This contention rests upon the premise that where a person so operates a motor vehicle as to strike and injure several persons at the same time his act constitutes but a single offense, if any, although two or more of the persons struck die as a result of the injuries received.

Decided cases in which pleas of former jeopardy have been considered fall into three principal classes: (1) Where there are different degrees of the same offense and the defendant has been acquitted or convicted of a charge involving one of those degrees. In such case the plea will be sustained. (*People* v. *Fox*, 269 Ill. 300.) This class comes under the doctrine of carving—*i. e.*, the taking of one out of the other. (2) Where the commission of larceny consists of the felonious act and different kinds or articles of property or articles of different owners are stolen there is but a single larceny, (*People* v. *Israel*, 269 Ill. 284; *People* v. *Perrello*, 350 id. 231,) and (3) where a single felonious act results in the commission of two or more crimes not embraced in different degrees of the same offense. This case falls within the third class. There was but a single physical act—the collision—from which two persons met their deaths.

Our constitution commands that no person shall be twice put in jeopardy for the same offense. A distinction obtains between an offense and the unlawful act out of which it arises. The act is the cause of the offense which, conversely, is the result of the act. The constitutional inhibition is directed to the identity of the offense and not to the act. (*State* v. *Billotto*, 104 Ohio St. 13.) This is the basis of the holding in *People* v. *Israel, supra*. In that

case junk belonging to different owners was stolen from the same building at the same time. Similarily, in *People v. Perrello, supra,* several individuals were robbed at the same time in a hold-up of a social gathering. In each of those cases this court held that the whole transaction constituted but one offense and could be prosecuted as such. Several physical acts may constitute one crime or offense. On the other hand, two or more distinct offenses may grow out of the same transaction or act, and the rule that a person cannot be twice put in jeopardy for the same offense has no application where two separate and distinct crimes are committed by one and the same act. (*People v. Fox, supra; Spears v. People,* 220 Ill. 72; Wharton on Crim. Evidence, (10th ed.) sec. 578; 3 Greenleaf on Evidence, (15th ed.) sec. 36.) In the *Fox case* an acquittal on a former charge of arson was held no bar to a prosecution for simultaneously burning the contents of the building to defraud an insurance company. In *People v. Bain,* 358 Ill. 177, a prosecution for receiving deposits in an insolvent bank was held not to be barred by a former acquittal on a charge of conspiracy to receive those deposits. Where the night watchman of a building was killed during the commission of a burglary, the acquittal of defendant on a charge of murder was not a bar to a subsequent prosecution for the burglary. *People v. Andrae,* 305 Ill. 530.

When a former acquittal or conviction is pleaded in bar of a subsequent prosecution, the test is whether the facts charged in the latter indictment would, if found to be true, have justified a conviction under the earlier indictment. If they do, then the judgment on the earlier indictment is a complete bar to a prosecution under the later indictment, otherwise not. (*People v. Bain, supra; People v. Greenspawn,* 346 Ill. 484; *People v. Mendelson,* 264 id. 453; *Campbell v. People,* 109 id. 565; *Durham v. People,* 4 Scam. 172.) The same principle is expressed in Wharton

on Criminal Law, (6th ed.) sec. 565; *State* v. *Billotto, supra,* and *State* v. *Corbett,* 117 S. C. 356.

Applying these principles to the facts in this case, the question presented is: Could a jury in the former case, which charged the manslaughter of Ray Duran, have returned a verdict for the manslaughter of Charles Klafter? In indictments for offenses against persons or property the name of the person injured must be stated, if known. The necessity for stating the name of the person injured is to enable the defendant to plead either a former acquittal or conviction in case of a second prosecution for the same offense. (*People* v. *Clavey,* 355 Ill. 358; *People* v. *Smith,* 341 id. 649; *Aldrich* v. *People,* 225 id. 610; *Willis* v. *People,* 1 Scam. 399.) An accused cannot be tried for the manslaughter of any other person than the one charged by the indictment upon which he is then being tried. The substance of one crime cannot be proved by proving the substance of another. (*State* v. *Billotto, supra.*) A conviction or acquittal under one charge is a bar to a prosecution for another crime growing out of the same act only where the offense for which the accused was tried and acquitted or convicted is but one of the degrees of the same offense for which it is later attempted to put him on trial. (*People* v. *Fox, supra.*) In order for one prosecution to be a bar to another it is not sufficient to show that the act is the same, but it must be shown that the offense, also, is the same in law and in fact. *People* v. *Fox, supra; People* v. *Mendelson, supra; Nagel* v. *People, supra.*

We recognize the conflict among decisions in other jurisdictions. Some of them are opposed to the views expressed by this court. Many of them are based upon provisions of local laws. Some of them have, in effect, been nullified by later decisions of the same tribunals, and others have been criticised by adverse holdings in other jurisdictions.

Defendant places reliance upon a number of cases which will be reviewed. In *State* v. *Cosgrove,* 103 N. J. L. 412,

a motorist accidentally struck two persons with his car, killing one and injuring the other. He was charged with manslaughter and assault and battery. It was held that the act of the accused constituted only a single offense. The *Cosgrove case* is based on the earlier case of *State* v. *Cooper,* 13 N. J. L. 361. In the *Cooper case* a plea of *autrefois convict* was sustained to an indictment for murder, the defendant having been previously convicted of arson, resulting in the death of the person for whose murder he was indicted. That holding is contrary to the decision of this court in *People* v. *Andrae, supra.* In *People* v. *Fox, supra,* our court pointed out that the decision in the *Cooper case* rested on a statute of New Jersey making the crime of arson murder where a person was killed in the fire, the murder being, under the statute, only a higher degree of the same offense. This places the *Cooper case* in the first class of cases previously enumerated. The *Cosgrove case,* being based on the *Cooper case,* is not persuasive.

*State* v. *Wheelock,* 216 Iowa, 1428, a case involving the manslaughter of three persons by an automobile; *People* v. *Barr,* 259 N. Y. 104, involving a prosecution for manslaughter of ten persons in a fire, by negligence in failing to install sprinklers; *Woodford* v. *People,* 62 N. Y. 117, where an indictment charged the burning of thirty-five buildings by setting fire to one of them; and *Smith* v. *State,* 159 Tenn. 674, under facts similar to *State* v. *Cosgrove, supra,* tend to support defendant's theory, but they are contrary to the established policy of the law in Illinois, repeatedly announced by this court.

In *Commonwealth* v. *Veley,* 63 Pa. Sup. Ct. 489, three people were killed by the breaking of a dam. The defendant was charged with manslaughter through negligence. The court held there was but one causal effect though the result affected many parties and there was but one injury to the State. The prosecution was under a statute pertaining to involuntary manslaughter, providing for the admis-

sion in evidence of any act or acts of manslaughter. The court evidently construed the intent of the statute to treat all the occurrences as one offense. This is another example of statutory construction. *Commonwealth* v. *Ernesto,* 93 Pa. Sup. Ct. 339, is to the same effect.

Numerous cases supporting the rule that a conviction or acquittal of one charged with the murder of or an assault upon one person is not a bar to his subsequent prosecution for the murder of or an assault upon another person at the same time are collected in *State* v. *Corbett, supra,* and the accompanying annotations in 20 A. L. R. 341. Some of them may be noted: *People* v. *Majors,* 65 Cal. 138, and *State* v. *Vines,* 34 La. Ann. 1079, each of which involves a simultaneous double murder by two defendants; *Teat* v. *State,* 53 Miss. 439, for a similar crime; *Keeton* v. *Commonwealth,* 92 Ky. 522, where a pistol was pointed at two persons at the same time in demand for property; *Commonwealth* v. *Browing,* 146 Ky. 770, where two persons were wounded by the same bullet in an affray; *People* v. *Warren,* 1 Park. Crim. (N. Y.) 338, where poison was mixed with flour, resulting in the poisoning of different persons; *Vaughan* v. *Commonwealth,* 2 Va. Cas. 273, where two persons were shot by the same discharge of a gun. These cases are in harmony with the decisions of this court.

*State* v. *Fredlund,* 273 N. W. (Minn.) 353, is in accord with the result reached by this court. Conformably to the provisions of an applicable Minnesota statute the trial court certified the following question to the Supreme Court of the State: "In a case where two automobiles collided on a public highway resulting in the death of two persons who were passengers in one of said automobiles, and the driver of the other automobile is charged in each of two indictments with murder in the third degree, one of said indictments being based on the death of one of said passengers and the other indictment on the death of the other passenger, does acquittal of the charge contained in one of said

indictments operate as a bar to further prosecution for the offense charged in the other indictment?" Defendant Fredlund, as does defendant Allen, in the case before us, particularly relied upon *State* v. *Wheelock, supra, State* v. *Cosgrove, supra,* and *People* v. *Barr, supra,* as determinative of his position. Upon consideration of these authorities, together with additional cases involving the same question from other jurisdictions, the court rejected the defendant's contentions and held that the protection afforded by the plea of former jeopardy is not against the peril of second punishment, but against being again tried for the same offense. "The constitutional provision against double jeopardy has, as we have seen," the court said, "for its objective that no one shall be brought into danger of punishment for the same offense more than once. But neither in the Federal nor in our own constitution is there any prohibition against successive prosecutions if the wrongful *act* is the cause of separate and distinct *offenses.*" The court held, further, that it is the identity of the offense, and not of the act, which is referred to in the constitutional guaranty against putting a person twice in jeopardy, and specifically, where two or more persons are injured in their persons, though it be by a single act, yet, since the consequences affect, separately, each person injured, there is a corresponding number of distinct offenses.

*Fay* v. *State,* 71 Pac. (2d) 768, decided September 10, 1937, by the Criminal Court of Appeals of Oklahoma, follows the *Fredlund case* and is in conformity with our conclusion. There, the defendant Fay's automobile struck two children, Betty Joe and Genella Brewer. He was first tried and convicted of the crime of assault with intent to kill Betty Joe Brewer. Subsequently, he was tried and convicted of assault with intent to kill Genella Brewer. Upon review, the defendant insisted that his plea of former jeopardy should have been sustained for the reason that the injury to Genella occurred at the same time that Betty Joe

was injured by his car, and, the injuries occurring practically at the same time and the same place, were not separate crimes, but one act. In rejecting the contention, the Oklahoma court said: "While the authorities are not in harmony on the question involved in this case, we hold that the greater weight of respectable authorities sustains the contention of the State that, notwithstanding the fact that the injury of the Brewer girls was caused by the car of the defendant striking them at or near the same time and place, the injury to each of the girls constitutes a separate offense, and that the contention of the defendant that he could not be put on trial for the injury to Genella Brewer, after he had been tried and convicted and his case pending in the Criminal Court of Appeals for the injury to Betty Joe Brewer, is without merit. This court holds that where two or more persons are injured by a single criminal act, there are as many separate and distinct offenses as there are persons injured by the unlawful act."

Adhering to the general rule and our former decisions in analogous cases, we hold that the deaths of Ray Duran and Charles B. Klafter named in the separate indictments were separate offenses. The trial court properly denied defendant's petition for discharge.

Objection is made that the court erred in permitting Mather, who was struck by defendant's car at the same time as Klafter, to exhibit his bandaged leg to the jury, and to remove some of the bandaging. From the record it appears that the witness came into the court room on crutches, and, on cross-examination, by defendant's counsel, testified that it had been necessary for him to use them continuously since the accident—being unable to walk without such assistance. Mather was also asked, on cross-examination, if, on certain named occasions, he had not walked without the use of his crutches. The objection of the prosecution to this line of questioning was overruled, and Mather was permitted to answer, denying that he had

done so. On re-direct examination, upon interrogation by an assistant State's attorney, Mather stepped in front of the jury box, raised his trouser leg and exhibited his bandages to the jury in order to show the condition of his leg. The defendant's objection was overruled. It thus appears that the matter of the injured leg, and the ability of Mather to walk, without artificial aid, was brought out by the defendant over the objection of the prosecution. Furthermore, defendant and two witnesses, called by him, declared that prior to the trial they had seen Mather walk on the streets naturally, entirely without the use of crutches. Of these, one was a long-time friend of the defendant, who had grown up with him in a small southern city. After defendant's witnesses had testified that they had seen Mather walk naturally, the prosecution re-called the latter, and, in rebuttal, again had him lift up his trouser leg. In the colloquy incident to ruling on defendant's objection thereto, the assistant State's attorney stated that it was decided to show Mather's injuries after defendant had called witnesses to show he could walk. The court sustained the objection to the second exhibition of the injured limb, and admonished the jury to disregard the scene in front of the jury box, stating that no more had been shown than exhibited the first time. A physician and surgeon, called as a People's rebuttal witness, testified that he was treating Mather for injuries, among others, a compound fracture of the shin bone running from the knee to the ankle, received on February 16, 1935; that he saw him two or three times a week, and that he had never seen him without his crutches. The witness expressed the opinion that Mather could not move around without them.

The ability of Mather to walk without crutches was not a proper issue in this case. A witness may not be impeached on a collateral matter. The prosecution was warranted, however, in attempting to rebut unfavorable inferences against the witness, or, on the other hand, favorable infer-

ences in behalf of the defendant, under the circumstances narrated. *People* v. *Oliff*, 361 Ill. 237; *Wilson* v. *People*, 94 id. 299.

Complaint is made concerning the court's refusal to give to the jury an instruction defining intoxication, and in failing to define the degree of intoxication which would render the driving of a car unlawful and, thereby, according to the defendant, left an important element of the case to the speculation of the jury. It is true that the evidence discloses that defendant had two small highballs before dinner, at least two hours prior to the accident. The prosecution did not claim or attempt to prove that defendant was inebriated. No witness testified that he was under the influence of alcoholic liquors, before, at the time of, or after the collision. Obviously, intoxication was not an issue in this case. It follows that the court was warranted in refusing to give the proffered instruction. *People* v. *Schneider*, 362 Ill. 478, cannot avail defendant. Intoxication was an issue in that case as it was in the former appeal. *People* v. *Schneider*, 360 Ill. 43.

Defendant further insists that the assistant State's attorneys, in their arguments to the jury, made improper, inflammatory and highly prejudicial remarks not based on the evidence. We have read the arguments to the jury comprising more than one hundred pages of the record. Only six objections were interposed by defendant's counsel to the extended remarks of the assistant State's attorneys. Four of these and two statements not objected to, defendant now contends, were prejudicial. One of the prosecutors, in the opening statement, said: "Oh, there is a conspiracy here among the State's witnesses to put this man in jail or convict him or put him on probation." Counsel objected and requested that the prosecutor be admonished. The court sustained the objection. Again, in the closing argument, it was said: "Your verdict does not put anybody in the penitentiary as they want you to believe

in appealing to your sympathy, so whether this man is sentenced any place if you find him guilty rests solely in the discretion of the court." Defendant's objection was sustained. The quoted statements are assailed on the ground that the court was without discretion as to the penalty for manslaughter, and that a penitentiary sentence of not less than one nor more than fourteen years was mandatory. The amendment to the Criminal Code of July 5, 1935, (Laws of 1935, p. 721; Smith-Hurd Stat. 1935, p. 1244;) made manslaughter a probationable offense. Indeed, defendant availed himself of that provision by making a motion for probation. Furthermore, the court instructed the jury that it was not concerned with the question of what the law provides as punishment of the crime charged, pointing out to the jurors that their duty was merely to determine the guilt or innocence of the accused, and, that, under their oaths, they must completely disregard the question of and arguments relative to punishment. Defendant directs our attention to the fact that one of the prosecutors pointed out the defendant in the court room and said: "Look at Allen! Is there any look of remorse on his face? Is there any showing there that he has suffered?" This statement was undoubtedly provoked by argument of defendant's counsel: "I don't think there is a person who has suffered more mental agony than John Allen." Counsel on both sides might well have been more temperate in their arguments. The statements about one of defendant's witnesses were legitimate inferences from the facts and circumstances proved and, hence, within the rule of proper argument. Two other statements alleged to constitute inflammatory discussion were not objected to, and the propriety of the remarks assailed is, therefore, not properly preserved for review. Had timely objection been made we could not, however, hold the statements prejudicial. One of defendant's trial attorneys, able and experienced, in addressing the jury, referred to his extensive experience

at the bar and well said: "I have concluded that very seldom is the jury swayed to sign a verdict by reason of arguments." His comment is particularly pertinent and decisive here.

The remaining contention of the defendant is that the evidence is insufficient to sustain his conviction. Every person who drives upon a public highway is under a legal obligation to observe, in the control and management of his motor vehicle, the exercise of reasonable care to prevent injury to others. (*People* v. *Adams*, 289 Ill. 339; *People* v. *Falkovitch*, 280 id. 321.) Where a person with willful and wanton negligence drives his automobile in a reckless manner, in disregard of the safety of others, and thereby runs over and kills another, even though unintentionally, his action constitutes manslaughter. (*People* v. *Peterson*, 364 Ill. 80; *People* v. *Herkless*, 361 id. 32.) Flight from the scene of a collision without any effort to ascertain the extent of the injuries caused by his act or to aid the injured person may be taken into consideration as evidence of guilt. (*People* v. *Herkless, supra; People* v. *Smaszcz*, 344 Ill. 494; *People* v. *Schwartz*, 298 id. 218.) It is the province of the jury to determine, from a consideration of all the evidence, under correct instructions, whether defendant is guilty of culpable or criminal negligence which was the proximate cause of the resultant death. (*People* v. *Peterson, supra; People* v. *Herkless, supra; People* v. *Smaszcz, supra*.) In the present case, defendant, driving on a well-lighted wide street, struck and killed two persons and injured a third. The testimony as to speed, the traffic, the excellent mechanical condition of defendant's car, and, in particular, the fact that the street was well-lighted, buttressed by defendant's failure to stop his automobile and driving on for more than three blocks, together with other facts and circumstances shown by the evidence, was sufficient to sustain a verdict of guilty. It is true, as defendant points out, that there are certain inconsistencies

in the testimony of several witnesses for the People. The discrepancies are not, however, of such a character as to impair the effect of their testimony in essential particulars, and to justify its rejection. The law has committed to the jury the determination of the credibility of the witnesses and the weight to be accorded to their testimony. We can not say that the verdict of the jury is palpably contrary to the weight of the evidence. Under this situation, and where errors of law have not occurred which would warrant a reversal, we will not substitute our judgment for that of the jury. *People* v. *Herkless, supra; People* v. *Wallage,* 353 Ill. 95.

The defendant was ably represented and had a fair trial. The record, while not free from error, does not, however, contain reversible error.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE SHAW, dissenting:

I am unable to concur with the views expressed in the foregoing opinion and because of the importance of the constitutional point involved feel it necessary to state my views. It must be borne in mind that under the rule announced in this case a citizen may be tried an indefinite number of times for the same criminal act until a jury is finally found which will render a verdict suitable to the prosecution. Under this rule, if a grossly negligent act should result in a large number of deaths, the defendant might be tried as many different times as there were deaths involved. Even though jury after jury might find that he had not been grossly negligent he could be compelled to return again and again to stand trial on this one point, which is the gist of the case.

The crime involved is a single offense against the peace and dignity of the People—*i. e.,* the reckless driving of an automobile. This is an offense under the Motor Vehicle act

whether or not any one is injured or killed. This identical offense—*i. e.*, reckless driving, becomes involuntary manslaughter by virtue of the Criminal Code and regardless of any intent of the defendant, if one or more persons are killed and no matter how many or how few are killed. The defendant need have no criminal intent of any kind, as the result of the act, rather than the intent, is what determines the character of the crime, and that character is fixed by the happening of one death or many from the same act.

This has been so definitely held in so many cases in other States as to make any review of the authorities in this dissenting opinion entirely unnecessary. Some of these cases are referred to in the majority opinion and no effort is made to distinguish them, nor can they be successfully distinguished. Many of the cases referred to in the opinion are such as involve intentional acts on the part of the defendant and, therefore, not in point. The *Minnesota case* relied upon has been severely criticized and, in my opinion, runs contrary to the better reasoning of the courts of many other States.

It is my view that this opinion definitely impairs that provision of the constitution upon which the defendant relies. Under this rule a defendant would be subjected to being put in jeopardy, not only twice but many times, for one criminal act. This is not only contrary to our constitution but oppressive to my personal sense of justice. It is to be hoped that the Supreme Court of the United States will sometime take occasion to make an authoritative decision on this important question. The courts of Minnesota, Oklahoma, and now of Illinois, have ranged themselves in opposition to the older line of cases which appear to me to have been better decided.

Mr. JUSTICE STONE, also dissenting.