(No. 28044.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD STURCH, Plaintiff in Error.

*Opinion filed January 17, 1945.*

George M. Crane, and Darrow, Smith & Carlin, (W. W. Smith, and W. L. Carlin, of counsel,) all of Chicago, for plaintiff in error.

George F. Barrett, Attorney General, and Thomas J. Courtney, State's Attorney, of Chicago, (Edward E. Wilson, John T. Gallagher, Melvin S. Rembe, Richard B. Austin, and Alex J. Napoli, all of Chicago, of counsel,) for the People.

Per Curiam: The defendant, Edward Sturch, was indicted in the criminal court of Cook county for the crime of malicious michief. A jury trial resulted in a verdict

of guilty and a finding of the value of the property damaged, $14.50. Judgment was rendered on the verdict, and defendant was sentenced to incarceration in the county jail for three months and fined two hundred dollars and costs. Upon a writ of error, the Appellate Court for the First District affirmed the judgment. Thereafter, defendant prosecuted a writ of error from this court and the record is submitted for a further review.

Uncontradicted evidence discloses that early in the morning of December 2, 1942, defendant entered the Royal tavern, located at 701 North Clark street, Chicago. Tom Gerald was the prosecuting witness and claimed to be the owner of the tavern and its contents. Using threatening and profane language, defendant demanded that Fred Stein, the bartender, produce Gerald at once. He picked up two heavy ash trays and hurled them across the bar, hitting, breaking and destroying eight bottles of whiskey valued at thirty dollars. Defendant then ordered a young woman employed as a "dice girl" and two patrons to line up along the wall, directing them to stay there. One of the customers ran out and defendant pursued him, calling to him, "Stop, or I will shoot." He returned immediately, however, shouting to the bartender, "I want this place closed and keep it closed." Thereupon, defendant stalked out of the tavern. During the time he was present, he twice ordered Stein to tell Tom Hill to refrain from calling up the police department. Later, accompanied by a woman, defendant returned to the tavern and ordered refreshments. Shortly, he was taken into custody by three police officers. To the inquiry of officer Richard Martin whether he broke up the tavern, defendant replied, "I didn't break the place up."

To obtain a reversal, defendant strenuously contends that the evidence is insufficient to sustain the verdict and, coupled with this contention, charges errors in the admission of evidence. The applicable statute requires that, in

order to constitute the crime of malicious mischief, the goods or chattels destroyed must be those of another. (Ill. Rev. Stat. 1943, chap. 38, par. 425.) The indictment charges the destruction of eight bottles of whiskey, the property of Tom Gerald. Defendant contends that the evidence shows he had a substantial interest in the Royal tavern and, in particular, the merchandise destroyed. The destruction of the whiskey by defendant is conceded. The decisive issue presented for consideration is thus narrowed to a determination of whether the evidence supports the finding of the jury to the effect that Gerald was the owner of the property destroyed. A review of the relevant testimony is required.

Tom Gerald testified that he was the owner of the Royal tavern; that all the liquor there on December 2, 1942, was his property; that the license at the Royal was in his name; that he had formerly owned an interest in two other taverns known as the Diamond and the Pelican; that he, Tom Hill, and defendant were partners in the Diamond, each having contributed about $1000 to the enterprise; that Hill and he purchased the Pelican and, subsequently, defendant made a capital contribution of $250 and became a partner; that defendant was a silent partner in both the Pelican and the Diamond, but was never a partner in the Royal; that defendant never appeared in any papers as a partner in the Pelican or Diamond, and never signed any partnership agreement with him. Gerald testified further that he had been acquainted with defendant about four years; that he met him at the time he (Gerald) closed the deal for the Royal in 1939; that John Marr handled the transaction and defendant had nothing to do with it; that both the Pelican and the Diamond were closed because they proved to be unprofitable ventures; that Harry Glickoff and Hill were in charge of the Pelican and the Diamond, respectively, when they closed; that when the Diamond closed nothing was taken from its

premises to the Royal; that when the Pelican closed he, himself, took to the Royal the cash register, and some tables, chairs, stools, a portion of the stock of merchandise and the piano, explaining that he had loaned the tables, chairs, stools and piano to the Pelican and, since they belonged to him, took them back when the place was closed. Referring to the stock of liquors, Gerald added that he also brought some stock to the Pelican from the Royal and when the Pelican closed, "I took what I had coming."

Stein, the bartender at the Royal, testified that his employer was Gerald; that he had previously been employed at the Pelican; that when the bartender at the Royal entered the armed services of the United States, he took his job; that the Pelican was then still open, and Gerald and defendant were partners in its operation; that when the Pelican was closed all the stock was taken to the Royal, but that the bottles of whiskey destroyed by defendant were not from the Pelican; that at no time while working at the Pelican did defendant give him any orders; that Gerald came over to the Pelican at different times; that although there was no exchange of employees from one place to another, he worked at the Pelican some nights and at the Royal on other nights; that he drew his salary from the Pelican when he worked there and, in turn, from the Royal when employed at the latter place; that no other employees worked in this manner; that a bartender named Kelly who worked at the Diamond was working at the Royal, and that Gerald and Tom Hill had an interest in the Diamond.

Defendant, a handbook operator, did not testify in his own behalf. To support his claim of owning an interest in the Royal tavern, he relies upon the testimony of John A. Marr, Frank Heenan and Harry Glickoff. Marr testified that he was a real-estate broker; that he had known defendant for more than fifteen years; that he had leased a few stores to him for handbooks, in other words, for the

conduct of gambling establishments, the leases always being taken in the names of persons other than defendant; that Arthur Calder, who placed the Royal in his hands for sale. asked if he knew of a good tenant; that in reply he advised Calder, "I have two good men for you;" that defendant and Tom Hill brought Gerald and one Lapin to him; that Lapin asked defendant to be a partner and defendant replied, "Yes;" that defendant paid $500 in consummating the sale, which was closed at a price of $2500, on terms of $1000 in cash and the balance in monthly payments of $100. According to Marr, he received no commission on the deal. Marr testified, further, that Lapin and Gerald asked defendant to spend his time at the Royal and actively help in the business; that before the deal was closed Heenan, admittedly a partner of defendant in operating a handbook or "bookie" business, came to the office and gave defendant $500; that it was his recollection that this $500 was used by Gerald and Lapin in making the down payment of $1000 and that defendant also guaranteed the balance of $1500. Marr did not give any date for the transaction. Apparently, a bill of sale was executed, but it was not introduced in evidence. In any event, it is conceded that defendant's name did not appear on the document. Gerald and Lapin, according to Marr, were the only purchasers named in the assignments of the lease and in the bill of sale of the tavern. Marr said that defendant gave him no written guarantee for the balance of $1500, merely stating he would take care of it, observing that, without this promise, he, the witness, would not have closed the deal.

Heenan, who, according to his own testimony, was known as Frank Chance in the gambling business, declared that he had been engaged in the gambling business for twenty-one years in Chicago and in the locality of 750 North Clark street and 855 North Clark street; that he was in business with defendant, and that, besides the

"handbook business" he was in "dice and blackjack." He testified that they always divided the profits "right in the place of business," the sole exception being on the one occasion when he brought $500 to Marr's office and gave the money to defendant in Marr's presence.

Glickoff, engaged from time to time in operating a handbook, testified that he became manager of the Pelican tavern, in January, 1942, and continued in this capacity until it was closed the first day of the following November; that he also managed the Rose Bowl, located on North Rush street; that his employer at the latter place was defendant, and at the Pelican his employers were defendant and Gerald who, to his knowledge, were partners. Glickoff did not testify, however, that defendant and Gerald were partners in the ownership and management of the Royal tavern, where the criminal offense charged against defendant occurred. Indeed, he stated that he did not know anything specific about what was invested in the Royal by defendant. Glickoff testified, further, to conversations he overheard between Gerald and defendant concerning the Royal while in their employ, and among Gerald, Hill and defendant concerning the Pelican and Diamond; that defendant was endeavoring to obtain the return of some of the money he had invested in the three taverns, and particularly wanted to know the status of the business, "that they could not give him his money;" that records were kept at the Pelican; that, on the other hand, he never saw any records from the Royal, and that Gerald never exhibited to defendant any records in his presence, although they discussed business at the Royal in his presence. The testimony of Glickoff is fairly summarized by his statement to the effect that Sturch was a partner in all three taverns, "as I understood the situation to be."

. Gerald, in rebuttal, denied that defendant ever gave him the $500, or any other sum, for the purchase of the Royal, and also denied that defendant at any time in any

conversation in the presence of Glickoff, Tom Hill and himself asked for an accounting of the Royal or the return of any investment therein. He added that when he purchased the Royal, Lapin was his partner. Over the objection of defendant, Gerald identified, and the People introduced in evidence, an agreement, dated February 16, 1940, executed by Gerald and Philip Lapin which, after reciting that they had entered into a contract for the formation of a partnership under the style and name of "The·Royal" to engage in the general tavern business and the sale of liquors, provided in considerable detail for the dissolution of the partnership, transferring all right, title and interest of Lapin in the partnership business and assets to Gerald, and declaring that Gerald was to have the sole and exclusive right to use the name "The Royal" previously used as the partnership name. Defendant objected to the introduction of this agreement on the grounds, among others, that it was not binding upon him because he was not a party to it, that it was made outside his presence; and that he was not consulted and had no part in it and, further, that it was hearsay evidence.

The facts recounted disclose positive testimony by Gerald that he was the sole owner of the Royal tavern and the property destroyed. On the other hand, the testimony of Marr, Heenan (or Chance) and Glickoff tended to show that defendant had a financial interest in the tavern as a "silent" partner, or otherwise. The evidence adduced by the People, if believed by the jury, showed that the Royal was purchased in the fall of 1939 by Lapin and Gerald. The indictment charged that Gerald was the sole owner at the time of the perpetration of the crime of malicious mischief. Testimony of defendant's witnesses was to the effect that Gerald was not the sole owner of the tavern on December 2, 1942, and that defendant had an interest in the tavern and, necessarily, in the eight bottles of whiskey destroyed. The testimony of defendant's witnesses and, in

particular, Marr, indicated that Lapin and Gerald purchased the Royal. Marr testified that defendant brought Gerald and Lapin to him. If his statements were true, a deal was consummated, and a reasonable conclusion would be that Gerald and Lapin formed a partnership. It, accordingly, became necessary for the People to show that Gerald acquired Lapin's interest. This, the agreement dissolving the firm and transferring Lapin's interest to Gerald, tended to prove. If Lapin and Gerald had been partners at the time of the destruction of the property, it would have been necessary for the indictment to have alleged that the whiskey spilled and bottles broken by defendant were the property of Lapin and Gerald and not of Gerald, alone. The agreement of February 16, 1940, tends to prove the dissolution of a partnership between Lapin and Gerald and that, thereafter, Gerald was the sole owner of the business. Moreover, defendant is hardly in a position to complain of injury. So far as the record discloses, he never affirmatively asserted any interest in the property, and signed no written articles of partnership nor agreement of any kind nor bill of sale concerning the property. In short, defendant does not actually claim any interest in the property other than for the sole purpose of making a defense to the indictment. The challenged agreement corroborated Gerald's testimony that he was, on December 2, 1942, the sole owner of the property in question by showing that he had previously made a like statement in writing. The jurors were instructed that the prosecution must prove beyond all reasonable doubt that the property belonged to Tom Gerald and no other person had any interest therein; that the source of the funds with which defendant claimed to have purchased an interest in the tavern should not influence them, and, finally, if a reasonable doubt be entertained as to whether or not defendant owned the property, he should be acquitted. The evidence with respect to ownership of the tavern and the whiskey

was in conflict. For the adequate reasons that the agreement of February 16, 1940, corroborated the People's testimony and, conversely, rebutted the testimony of defendant's witnesses, and especially since the jury was adequately instructed in this regard, the contention that the instrument was inadmissible must be rejected.

Gerald's name was endorsed on the indictment as the prosecuting witness. Upon cross-examination, he was interrogated at length as to whether he had been asked for his consent to the endorsement. He answered that he did not understand what was meant by the question. The jury was excused and, upon further interrogation outside the presence of the jury, he stated that he did not remember whether he had given his consent. The first assistant State's Attorney was then permitted to testify, over objection, that Gerald was present when the case was presented to the grand jury and, answering an inquiry as to whether the property destroyed belonged to him, replied, "Yes;" that Gerald also answered in the affirmative when asked if he understood he was being named the prosecutor in the indictment and, further, that he declared he would carry the prosecution through and testify as the complaining witness upon the trial. The testimony of the assistant State's Attorney was admissible for the purpose of rebutting Gerald's testimony concerning the permission to use his name on the indictment as a prosecuting witness. It was, of course, inadmissible to prove exclusive ownership of the Royal by Gerald, but objection to the testimony was not made upon this ground. The applicable statute requires the endorsement of the name of a prosecutor upon the indictment by the foreman of the grand jury with the consent of the prosecutor, except in instances where the indictment is returned upon the information or knowledge of two of the grand jurors or upon the information of some public officer in the necessary discharge of his duty, in which case it should be stated at the end of the indictment how the

same is found. (Ill. Rev. Stat. 1943, chap. 38, par. 717.) Without the proper endorsement of the prosecutor, an indictment for willful and malicious mischief, not found upon the information of two grand jurors or some public officer, is void. (*People* v. *Novotny*, 371 Ill. 58.) The validity of an indictment is not a question for submission to the jury but is, instead, an issue of law for the trial judge to determine. Even if it be conceded that the testimony of the assistant State's Attorney was subject to objection, as not being responsive to any issue in the case, his evidence to the effect that Gerald told him he was the owner of the property was not prejudicial to defendant for the reason that Gerald, himself, testifying for the People, had previously stated that he owned the whiskey destroyed.

Complaint is also made that the argument of an assistant State's Attorney to the jury was unfair, prejudicial and inflammatory. Objection was interposed to only one remark. The other remarks which defendant now insists were prejudicial, not having been properly preserved for review by objections interposed thereto during the course of the trial, are not open to review. *People* v. *Bloom,* 370 Ill. 144; *People* v. *Allen,* 368 Ill. 368.

In his closing argument, the prosecuting attorney referred to the facts in evidence that, immediately after the commission of the alleged crime, when defendant had ordered the patrons and the dice girl to line up, one customer ran out of the tavern and defendant pursued him, calling, "Stop, or I will shoot," and that the bartender had heard some noise outside, but did not know just what it was. The jurors were told that, in view of the statement made by defendant, they had a right to take into consideration their past experiences in life in making reasonable inferences from the evidence presented and could use their own judgment in determining what the noise was. The prosecuting attorney is entitled to discuss the conduct of

the accused and to draw legitimate inferences from the facts and circumstances proved. (*People* v. *Howe,* 375 Ill. 130; *People* v. *Herkless,* 361 Ill. 32.) The assistant State's Attorney drew no inference from defendant's threat to shoot the fleeing customer, but left any inference to be drawn therefrom in determining the nature of the noise heard by the bartender entirely to the judgment of the jury. Jurors must test the truth and the weight of the evidence heard, and what it all proves, by their knowledge and judgment, derived from experience, observation and reflection. (*People* v. *Turner,* 265 Ill. 594.) They are not precluded from construing evidence in the light of their intelligence, common knowledge and experience of mankind. (*People* v. *Schaffner,* 382 Ill. 266.) The remarks of the assistant State's Attorney, asserted to be prejudicial, were within the legitimate scope of proper argument.

Defendant received a fair trial. No complaint is made with respect to the instructions given the jury, and the jurors, the trial judge and the Appellate Court, in succession, have decided that the evidence, although conflicting, was sufficient to convict. Upon the question of ownership of the tavern and the whiskey destroyed, the jury was fully and fairly instructed. Indeed, defendant makes no complaint here either with respect to instructions given or those refused. The record is not free from error, but the law is not primarily concerned with making a perfect record in the trial of a criminal cause where, as here, errors are either inconsequential or not prejudicial to defendant. *People* v. *Harrison,* 384 Ill. 201.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*