**People of the State of Illinois, Plaintiff-Appellee, v. Irwinna Weinstein, Defendant-Appellant.**

**Gen. No. 50,125.**

First District, Second Division.

December 21, 1965.

Rehearing denied and opinion modified January 12, 1966.

Frank G. Whalen, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Kenneth L. Gillis, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Irwinna Weinstein and Richard Mattox were indicted for the murder of Harvey Weinstein, husband of Irwinna. She was granted a severance. Mrs. Weinstein appeals from a judgment entered on a verdict finding her guilty of murder and sentencing her to a term in the State Reformatory for Women of from 20 to 30 years. The defendant's theory for reversal is that she was buried under an avalanche of State-induced prejudice which deprived her of a fair trial; that the court made improper rulings on the evidence, including an inflammatory prejudicial cross-examination of the defendant; that the jury was not properly instructed; and that she was not proved guilty beyond all reasonable doubt. The People's theory is that the evidence of guilt, though circumstantial, was conclusive; that the defendant and Mattox were linked in a common design to murder; that the defendant incited, aided and abetted in the murder; that her appeal strategy is to attempt to create an aura and environment of error by the accumulation of many unsubstantial points; that no harmful error occurred and that she received a fair and impartial trial.

On Saturday, September 28, 1963, Harvey Weinstein, husband of the defendant, was seen in good health around their home at 9716 Van Vlissingen Road, in

Chicago. At 5:00 a. m., on September 29, a truck driver, while near 138th Street on the Calumet Expressway, saw a station wagon drive into a garbage dump. When he again passed the area at 7:30 a. m. he saw the station wagon on fire. The license on the station wagon was registered to Royal Displays, the business where Harvey Weinstein was employed. This station wagon was frequently used by Harvey, who was employed by A. L. Slatin, father of defendant. Codefendant Mattox was also employed on and off by A. L. Slatin. The first police on the scene arrived at 5:40 a. m. The automobile was burning "profusely." Officer Gibson observed the remains of a corpse in the front seat. A police specialist from the Arson Unit later examined the car and found the gas tank intact. Because of the even burning the specialist felt that an accelerant was used in the fire. After the fire was extinguished, the corpse, badly scorched and partly destroyed, was transported to the morgue. The station wagon did not have a trunk. A jack handle was not found in the vehicle.

On Monday, September 30, Dr. Harold Wagner, the coroner's pathologist, and Dr. Peter Zullo, a dentist, examined the body. Present at the examination was Detective William Mitchell. Dr. Zullo compared dental charts produced by dentists who worked on Harvey Weinstein's teeth, with the teeth of the corpse. In his opinion the corpse was that of Harvey Weinstein.

Dr. Wagner testified that Weinstein's body was badly burned and charred. The scalp, the chest, the lower legs, the hands and forearms were burned away. An examination of the head revealed a star-shaped portion, an inch by an inch and one-half, of bone missing from the skull. Below the hole in the skull was a tear in the membrane through which blood had poured. The doctor felt that death was associated with this traumatic subdural hemorrhage. Other possible causes of death were obscured by the fire. Dr. Wagner testified that he found

85

no evidence of carbon monoxide in the tissues of the body, leading him to conclude that Weinstein was dead before the fire. In the stomach of the corpse, Dr. Wagner found approximately three ounces of partly digested food. From this he concluded that the food was eaten up to five hours before digestion stopped. Digestion could be stopped when a head blow or other trauma was sustained even though death did not follow until two hours later. The blood found on the charred corpse was analyzed and found to be Type A.

On Saturday, September 28, Shirley Lome, a nearby neighbor and long-time acquaintance of Mrs. Weinstein, received a telephone call about 11:00 p. m. A voice, later learned to be Mrs. Vilma Graziani, asked if "Winnie" and Harvey Weinstein were at home. Mrs. Lome, upon seeing the Weinstein station wagon in front of their house, answered, "Yes." Mrs. Graziani made the inquiry at the request of Richard Mattox. The defendant admitted that Mattox came to her home at 2:00 a. m. on Sunday, September 29th. She testified that Mattox and her husband had a fight, but said that it was over "money" and that they, both bleeding, walked from the house to "talk about this." A next door neighbor, Lester Michell, whose bedroom faces the Weinstein house, testified that at approximately 2:30 a. m. on Sunday, he heard a "moan" by his window, then heard a sound (wood banging against wood) like a gate slamming (the Weinstein backyard has two wooden gates) ; then Michell heard a vehicle pull rapidly away, the car wheels spinning on stones. Mr. Michell looked out his bedroom window and saw that the light was on in the Weinstein bedroom and the window open.

At 3:45 a. m. on Sunday, September 29, the defendant called Shirley Lome and said, "Come over right away, I need your help." The defendant told Mrs. Lome that Mattox (height 6 feet—over 200 pounds) and Harvey (height, 5 feet 9 inches, weight 175 pounds) had had a

fight and that Harvey was frightened and ran into Bonnie's bedroom. (Bonnie was the Weinstein's eight-year-old daughter.) The defendant told Mrs. Lome that they left in Harvey's station wagon and that Mattox was driving. The defendant asked Mrs. Lome to do her a "big favor"; if anyone questioned her, to say that Irwinna told her that she and Harvey had a fight and that Harvey had walked out. At 8:00 or 8:30 Sunday morning, the defendant called Mrs. Lome and said that the station wagon had been found in Calumet Expressway burning. The defendant repeated: "Please remember what I told you to tell anybody if they ask." The defendant then pointed to a spot on the doorstep and asked Mrs. Lome if it looked like blood. The defendant later cleaned the spot, as well as the bedroom, which had "mud" on the floor. Some time in the the early morning hours on Sunday, September 29th, Mattox returned to the Graziani residence in Steger, Illinois. He had no shirt on and his trousers were soiled. No injuries were sighted. At 7:00 a. m. on Sunday, the defendant brought several bags of laundry to Mrs. Lome's house, her machine being disabled. The defendant asked Mrs. Lome for a stiff brush. She took the stiff brush and clorox and left for the laundry. In the wash were two sponges. Defendant also asked Mrs. Lome if she could leave "something" in her closet. Later in the day the defendant gave Mrs. Lome two stuffed toy animals, suggesting that they belonged to Mrs. Lome's daughter.

About 10:00 p. m. on Sunday, when Mrs. Lome happened to look into her closet, she saw a suitcase which she recognized as defendant's. Upon opening it she saw something "red." She then closed it, but opened it the next day in the company of Lt. Cartan and Commander Flanagan. In the suitcase were a quilt and a blanket from Bonnie Weinstein's bed. Some time on Sunday, September 29, the defendant spoke with Detective William Mitchell. The defendant later called Mitchell on the telephone. Commander Flanagan and Lt. Cartan, of the

Chicago Police, after speaking with Mrs. Lome, talked with the defendant on Monday, September 30, at about 8:00 p. m. When asked if Harvey Weinstein had been murdered in the house, she nodded, "No." When asked if Mattox was involved, she answered, "Yes." Taken to police headquarters, the defendant was asked if she was having an affair with Richard Mattox. She replied, "How do you know this, who told you this?" When confronted with the suitcase the defendant said, "My God, don't open that!" Defendant then told the police that the suitcase contained a quilt and a spread from Bonnie's room and that they were bloody. She then told the police, substantially as she testified, that Mattox and Harvey had a fight, that both got bloody and that Harvey said, "We'll go outside and finish this" and that they walked from the house. Mrs. Weinstein told the police that she then went to sleep.

On October 7, 1963, Police Officers Anton Prunckle and Lt. Cartan, accompanied by Meyer Weinstein, the deceased's father, searched the Weinstein house. They found two books, two dolls, a white shirt and towel in a hamper and two stuffed toys, a rabbit and a teddy bear. Some of the articles, taken to the crime laboratory, had visible red stains or specks. When analyzed, a chemist testified that the objects with enough blood to be studied, revealed that the blood was Type A. On October 12, 1963, Prunckle and Cartan recovered two sponges from the kitchen of the Weinstein home. On October 29, 1963, a defense attorney was in the Weinstein home in the presence of the police officers. He was there for the purpose of taking pictures of the interior of the home. Meyer Weinstein gave the key for entrance to the home to a police officer. On March 7, 1964, Prunckle, Cartan and the defense attorney found certain stolen musical instruments in the Weinstein attic.

Shirley Lome and Mrs. Weinstein had been friends since they were 11 years of age. As close neighbors they

visited each other's homes frequently. Mrs. Lome was divorced. Mrs. Lome testified that she first saw Richard Mattox in the spring of 1963. He was painting and helping around the Weinstein house. Prior to this time Mrs. Weinstein complained to Mrs. Lome about her relationship with her husband, Harvey. The following is the testimony by Mrs. Lome of conversations between the two: In the last week of June 1963, Mrs. Weinstein said that Harvey had come home and found her and Mattox on the couch in the living room. Mrs. Weinstein said that she would wait and see what Harvey would say. That night Mrs. Weinstein said Harvey had decided to "forget it" because he assumed it had not been planned and would not happen again. On another occasion defendant said, "she could pull the wool over anybody's eyes." That same night, while Mrs. Weinstein spoke to Mattox over the telephone, she (defendant made the phone call from Mrs. Lome's kitchen telephone) said something about an "automobile accident"; and then, "You can't do that because my father drives the car," and "I drive it" and "sometimes Harvey has the children in with him." On another occasion in June, Mrs. Weinstein called Mattox on Mrs. Lome's phone. When asked what she was "planning," Mrs. Weinstein said, "Dick Mattox had hired someone to kill Harvey" and she "couldn't care less." Later that day Mrs. Weinstein again used Mrs. Lome's telephone to call Mattox. She told Mattox, "You have got to call it off, I can't do it to my father and I can't do it to my children, you have got to call it off." After she hung up she told Mrs. Lome that Mattox had hired someone to kill Harvey and he didn't know whether he could get in touch with the man he hired, but he was going to try. In the first two weeks in July, 1963, Mrs. Lome received long-distance calls from the defendant, vacationing in Michigan. On one call she said that Harvey had written a note implicating Mattox in case anything should happen to him. On subsequent calls Mrs.

Weinstein assured Mrs. Lome that nothing was going to happen to Harvey. In the middle of July, the defendant said that she was going to see a marriage counselor at the request of her husband. She said she was "going along with Harvey because she could fool anybody." In August, Mrs. Weinstein said she was "getting increasingly unhappy" with Harvey and that she didn't know how she was going on living with him very much longer. Mrs. Weinstein revealed that she and Mattox had been discovered at the Whitcomb Hotel on the day that Mrs. Weinstein had visited the marriage counselor. At that time the defendant expressed the fact that she wished the original plan had gone through. In August, Mrs. Lome visited the Weinsteins at their summer home in Michigan. While there, Harvey and defendant had a fight. Harvey called her names and she walked out of the house. Just after Labor Day, when in Chicago, defendant admitted that she had continued seeing Mattox in the basement of their home in Michigan and though "it was out of character" she felt she was "falling in love" with Mattox. She said she had him like a "dog on a leash" and likened him to a "tiger." She again said she wished the "original plan" to murder had gone through. Again in the week after Labor Day, Mattox knocked at Mrs. Lome's back door. Mrs. Lome called the defendant and then Mattox and the defendant left. Again in that week, defendant, when talking to Mattox over the telephone, said "I can't go on, I can't go on living with him any longer. How long do I have to wait? Am I going to have to wait until Christmas?" During the week of September 16, 1963, Mrs. Lome gave the defendant access to her home to feed her child, as she made a trip to the loop. Mrs. Lome said she returned home to find the defendant and Mattox using her bedroom. Three or fours days before September 28, the defendant said, "Don't be surprised if Harvey isn't around in the morning, because I am going to throw

him out." At various times the defendant said she tried to commit suicide and wished she could "black out all the street lights on her block."

The defendant testified that she had terminated her relationship with Mattox "about the middle of September" when she learned that he was married and had been in prison. On cross-examination she said "The last time I saw Mattox was in Steger, Illinois, which was the first two weeks of September, at which time I went to his home." When asked if she saw Mattox on September 16th in Mrs. Lome's bedroom, she said she "didn't remember." The defendant said she didn't expect to see Mattox on September 29. She "believed him to be out of the state." The defendant admitted putting the suitcase of bloody bedquilts in Mrs. Lome's closet and admitted conversations with Mrs. Lome about being discovered in the Michigan hotel with Mattox. She admitted telling Mrs. Lome that she had fallen in love with Mattox. She admitted meeting Mattox in the living room of their home when the children and Harvey were asleep, but denied most other conversations related by Mrs. Lome.

Mrs. Weinstein testified that Mrs. Lome was "drunk" on the evening of Saturday, September 28. Defendant's sister, Miriam Slatin agreed and added that Mrs. Lome was "drunk" virtually every time she saw her. Mrs. Lome denied being drunk. Six neighbors testified as to Mrs. Lome's good reputation for sobriety. The defendant testified that her husband sold stolen musical instruments frequently to men named "Dave" and "Morrie" who owned a pawnshop. One of the men lived next to her "Uncle Joe," the defendant said. This was denied by "Uncle Joe." A check by the police officers failed to turn up any sign of "Dave" or "Morrie." The defendant's maid testified that Shirley Lome, dressed in a housecoat, visited Harvey Weinstein in his bedroom for about an hour on Saturday afternoon, September 28. Harvey's

Rabbi testified that Harvey was in a north-side Temple that afternoon. Mrs. Lome denied ever having been intimate with Harvey.

On the first occasion Mattox visited the Weinstein home it was at the invitation of Harvey. The adulterous conduct of defendant was known to Harvey. There was testimony that Harvey and Mattox were seen together after Harvey knew of his wife's adulterous conduct. Harvey and Mattox had been arrested together in a minor case involving the repair of a TV set. Defendant denied the testimony of Mrs. Lome about the conversations except the one relating to her husband, Harvey, finding her (defendant) on the couch with Mattox.

Meyer Weinstein, father of Harvey, was appointed administrator of the estate of Harvey Weinstein, deceased, on October 7, 1963, and he obtained an injunction barring defendant's relatives and lawyers from entering Harvey's former home and changed the locks. On March 7, 1964, the police removed three musical instruments, an amplifier, tape recorder, camera and a projector from the attic of the house. The musical instruments were identified by a sheriff and three high school girls as having been stolen from a high school near Ft. Wayne, Indiana, on March 22, 1963. Defendant testified that these musical instruments, as well as other musical instruments, about 20 in all, were brought into the house by deceased and Mattox along with the tape recorders, movie cameras and projectors and that some of the musical instruments were sold in the house to a man named "Morrie."

Defendant urges that the People's proof is not sufficient to convict, that motive was completely lacking and that the best the People could suggest was that the defendant hated her husband. While this is the last point advanced by defendant, we take it up first because if she is right in her contention that the evidence is insufficient to convict, it will be unnecessary to con-

sider any of the other points. The defendant says that the finding of the stolen musical instruments in the Weinstein house with testimony that they were brought in by Mattox and Harvey, together with testimony that there were a series of other similar transactions and that the defendant heard the word "money" immediately before the fight, raised a serious question as to whether the altercation was over the affections of the defendant and that corroboration was found in the testimony that Mattox and Harvey were friendly after the affair was known to Harvey. Defendant asserts that it is incredible that she could have had any part in the fantastic plan to have Mattox come to her house at 2:00 a. m. while their two children were sleeping and either murder Harvey in the house or entice him out of the house. Defendant states that if she and Mattox had planned to kill Harvey it is inconceivable Harvey would have eaten after he left the house and that Dr. Levine, pathologist for the defendant, was of the opinion that Harvey had eaten after he had left the house. Defendant asserts that the evidence that Mattox murdered Harvey was entirely circumstantial and that the State had the duty of not only showing that defendant and Mattox engaged in the common design to murder Harvey but also had the obligation to show beyond a reasonable doubt and to a moral certainty that Mattox committed the crime and that the People failed to make this proof.

The State's theory is that the defendant incited, aided and abetted Richard Mattox, her illicit lover, to murder her husband, Harvey Weinstein, and that defendant, by sharing the common felonious design of Mattox, is accountable for his murderous act. The evidence showed that defendant and Harvey were married for 10 years and were the parents of two children. She (defendant) was having an extensive affair with Mattox, lasting for several months before the murder. During that time the defendant and Mattox had illicit sexual intercourse

93

at the deceased's home, at her father's summer home, at a neighbor's home and at a resort hotel. The defendant admitted being in love with Mattox and being "indifferent" toward her husband. The testimony of Mrs. Lome, a neighbor and long-time friend of defendant, showed the attitude defendant had toward her husband. According to this testimony the defendant spoke with Mattox about calling off an impending automobile accident for Harvey. She said she "couldn't care less" about the killing. In August, the defendant was getting "increasingly unhappy" with Harvey and wished the "original death plot" had gone through. She later called off the homicide by "accident," because she and her father also used the car. Just before Labor Day she said she liked having Mattox on a "leash" and wished the "death plot" had gone through. According to the testimony she said to Mattox, "I can't go on, I can't go on living with him any longer. How long do I have to wait?" Four days before September 28, the defendant said, "Don't be surprised if Harvey isn't around in the morning." On September 29, at 5:30 a. m., the incinerated corpse was found within his flaming station wagon. Defendant testified that on September 29, at 2:00 a. m., Mattox was in the backyard of their home. She testified that Harvey said, "Allright Dick, I know it's you. Come in here"; that Mattox came in and that both men yelled and fought in the hallway and eventually in a child's bedroom. According to the defendant, Harvey now bleeding profusely, said, "Let's go out and talk about this." The defendant said Mattox was bleeding, too. A witness who saw Mattox later that morning saw no wounds. There was testimony that blood, splattered in tiny specks, could come from a traumatic blow to the head.

The defendant then went to sleep on the couch, awakening at 3:45 a. m. at which time she called Mrs. Lome and asked her to come over. A suitcase full of bloody bedspreads and two blood specked animals were taken to

94

Mrs. Lome's house on Sunday night. The defendant admitted wiping up some spots of blood and cleaning the bedroom floor. Defendant said that she broke with Mattox in mid-September; but she saw him at Mrs. Lome's on September 16; and Mattox was in the alley later that week. She testified that Mattox fought with Harvey over "money" but she did not tell that to Commander Flanagan. The defendant testified that the suitcase contained a little blood from facial wounds, but when confronted with the suitcase, she said, "My God, don't open that!" She said that the pawnshop man lived near her Uncle Joe. The Uncle denied that any pawnshop men lived near him. The police investigation supported this denial. Defendant said that the blood came from facial wounds. The wide splatter of blood would indicate a traumatic blow. The defendant branded her husband Harvey as a "fence" who sold valuable instruments for $10 each. The defendant branded Mrs. Lome as a "drunk." The neighbors denied that Mrs. Lome was a drunk. Defendant said that five-foot-nine-inch Harvey initiated the fight by pushing two-hundred-pound Mattox around. The People inquire "if the defendant did not incite, aid and join the common design to murder, why didn't she (defendant) report her knowledge of the crime after the burning car was found and why did she hide the bloody blankets and toys and fail to tell the police of them."

 There was competent evidence that defendant exercised control over the actions of Mattox; that she disliked her husband; that she desired to have him dead; that she and Mattox set one death plan; that she had the ability to stop the plan; that she kept up her illicit relations with Mattox; that she again and again indicated her displeasure with Harvey, and in the early morning hours of September 29, 1963, when her husband was gone, cleaned up the blood, but did not notify the police. Circumstantial evidence is sufficient to prove

guilt. The jury verdict will not be disturbed "unless unreasonable, improbable, and unsatisfactory." See People v. Huff, 29 Ill2d 315, 194 NE2d 230; People v. Kelley, 29 Ill2d 53, 193 NE2d 21; People v. Fedora, 393 Ill 165, 65 NE2d 447, and People v. Hanson, 359 Ill 266, 194 NE 520. The State presented strong evidence of motive in that she shared with Mattox in the common felonious design to murder her husband. We find that there was credible evidence to prove the defendant guilty of murder beyond a reasonable doubt as charged in the indictment.

 Defendant maintains that persistent deliberate prejudice deprived her of a fair trial. During the course of the trial, on Thursday, June 18, 1964, the State moved to recess the cause until the following Monday because Detective Mitchell was in the hospital and under the care of Dr. Shinglman. The court instructed the jury that the cause would be recessed until Monday morning because of the illness of the State's last witness. Defendant objected on the ground that it would give the jury the impression that there was some sinister evidence that this witness would give if he were able to appear. On Monday, Dr. Shinglman testified that Detective Mitchell was in the hospital under his care and over objection, was permitted to state that Detective Mitchell had acute plural pneumonia and that it would be dangerous for him to leave his bed. Defendant's motion to strike this testimony and for a mistrial was denied. The State rested. Defendant says that while she had waived her right to have the jury kept together she could not be expected to anticipate the publication of newspaper articles concerning the testimony that Detective Mitchell was expected to give. The defendant was her own first witness. The State in cross-examination of the defendant developed that Detective Mitchell had come to her home on the afternoon of the day of the murder. Defendant says the motive of the State was

obvious and was to show only that the State had been deprived of a star witness. The State may explain the absence of a witness in order to rebut any adverse inference arising from a failure to produce. Wigmore on Evidence, Vol II, sec 285. During the State's case Dr. Harold Wagner testified that Detective Mitchell was present at the morgue with the charred body of the deceased on September 30, 1963. On cross-examination, Dr. Wagner testified that Mitchell told him the body had been in a fire in a car and he thought the body was that of Harvey Weinstein. Dr. Wagner had another conversation with Mitchell after the autopsy and he (Dr. Wagner) explained his findings to Mitchell. Since the body was discovered on September 29, 1963, and Mitchell had knowledge of the matter on September 30, it is obvious that Mitchell was one of the first investigating officers on the case. The defendant cannot complain of newspaper publicity of Mitchell's supposed testimony where the trial judge repeatedly and carefully admonished the jury to refrain from reading or listening to any publicity about the case. The defendant did not show that any juror had seen a newspaper article. The court did not err in admitting the evidence as to the reason for Mitchell's absence as a witness.

■■ The next point advanced by the defendant is that the cross-examination of her with reference to her failure to volunteer information to Detective Mitchell on matters he did not inquire of was prejudicial on the part of the State and error on the part of the court. The State, having developed on cross-examination, that Detective Mitchell had visited defendant in her home on the afternoon of the day of the murder with no indication that she was being accused of the crime or suspected of the crime, was permitted over the objection of the defendant to ask eighteen questions. Defendant on direct examination testified that Mattox unexpectedly arrived at her home and had a fight with Harvey in a bedroom,

97

after which Harvey said, "Let's go out and talk about this." The men, both bleeding, washed up and left the house, according to the defendant. The defendant admitted leaving a suitcase containing bloody bedquilts and two toy animals with Mrs. Lome. The defendant testified that when she saw Officers Cartan and Flanagan, she told them "What I said here today." On direct examination, the defendant did not mention Detective Mitchell. On cross-examination the State ascertained that the defendant spoke with Mitchell on Sunday, September 29, after she had learned of the recovery of the charred body. The defendant admitted, without objection, that she did not contact the police. The defendant was then asked if she told Mitchell about the suitcase containing the bloody quilts; if she showed Mitchell where she cleaned up the flecks of blood; if she showed Mitchell the dolls splattered with blood; if she showed Mitchell the spot she cleaned with the "doggie brush" and if she showed him the stuffed animals. She admitted that she did not tell Mitchell of these matters. She was asked if she told Mitchell of the "fight in the child's bedroom." She admitted that she did not tell Mitchell of the "fight." We think that the above questions were proper means of cross-examination. A failure to assert key facts when it would be natural to assert them amounts to a positive assertion of the nonexistence of the facts. Wigmore on Evidence, Vol III, sec 1042. Since the defendant testified that a fight occurred between Harvey and Mattox, the fact that she did not tell this to Detective Mitchell, the first officer to see her, amounts to an assertion that no fight occurred. Defendant relies on Larrance v. People, 222 Ill 155, 78 NE 50. Because of the difference in the factual situation, we do not believe that the Larrance case is applicable to the situation here. In the instant case, Mitchell was seeking to find out from Mrs. Weinstein if the charred corpse was the remains of her husband, Harvey Weinstein. It would be natural for Mrs.

Weinstein to relate that her husband and Mattox had been in a fight in their house and that her husband had been wounded. Her failure to do so amounts to an assertion that the fight did not occur. There was no testimonial compulsion. She voluntarily took the stand and chose to testify. In People v. Rothe, 358 Ill 52, 192 NE 777 cited by defendant, the court held that proof of a refusal to give a statement to the police is immaterial and prejudicial. In the instant case Mrs. Weinstein did not refuse to speak to Mitchell. She admitted telephoning him the next day. We do not find error in the cross-examination of the defendant.

■■■■■ Defendant says that her cross-examination was outside the scope of the direct examination. Cross-examination is ordinarily limited to subjects covered in the direct examination, because other subjects would not be relevant. A person may also be impeached by a prior inconsistent statement or act, even though that statement or act rests in time and place outside the direct testimony, if the statement or act is not collateral. Wigmore on Evidence, Vol III, sec 877. Defendant insists that prejudice and error were compounded in argument to the jury wherein the State argued that when the defendant was on the stand she denied telling Mitchell the story she now tells and that this conduct of the State was for the sole purpose of prejudicing her in the mind of the jury. The trial judge felt that the argument was in error and sustained objections thereon. We think that the argument, based on the record, was not improper. The defendant admitted that she did not tell Mitchell important facts which were a part of her testimony. The State had a right to comment on this in arguing the case.

■■■■ Detective Commander Flanagan interviewed defendant at her home the day after the murder. Defendant was cross-examined with reference to her failure to mention to Commander Flanagan or Lt. Cartan whether

99

she told police that Harvey washed up; what details she failed to mention; what she said the argument in the house was about; did she mention money to Lt. Cartan; didn't she tell her father that she and Harvey had a fight; did she get the dolls down then and show them to Lt. Cartan and Commander Flanagan. The defense says that this cross-examination concerning defendant's failure to volunteer information to Detective Mitchell on matters he did not inquire of, was prejudicial error. The defendant admitted that she did not relate the key elements of her defense to the officers. She did not tell them that Harvey had "washed up" after the fight. She did not tell them that "money" was mentioned during the fight. She did not show the blood splattered dolls to the officers. We think that this method of impeachment in the context of this case by the use of prior inconsistent conduct was proper.

■■ We turn to the argument of the defendant that the unwarranted personal attack in final argument on the integrity of defendant's counsel to the effect that they placed musical instruments in the Weinstein home in violation of a Probate Court Order was prejudicial error. We agree with the State's Attorney that the record does not show that there was a personal attack by the State's Attorney on the integrity of defendant's counsel. The defendant contends that the State, in closing argument, charged that the defense planted the stolen musical instruments in the Weinstein attic. Harvey Weinstein was murdered on September 29, 1963. On March 7, 1964, the stolen musical instruments were found in the attic. The State could properly remark on the five months' lag in establishing the existence of the evidence upon which the defense relied. The State argued that the stolen instruments had nothing to do with the crime. We do not see any error in this argument.

The defendant says that the direct examination of State witness Flanagan as to an inquiry he made of de-

fendant's attorney in the presence of defendant as to whether he would permit his client to give a written statement was prejudicial error and that her motion for a mistrial should have been granted.

 During the direct examination of Commander Flanagan the State proved that the defendant told the police a certain story similar to her trial testimony. After the defendant's attorney arrived at the police station, Flanagan, in the presence of defendant and her attorney, repeated what the defendant told him. Flanagan then asked Mrs. Weinstein if what he had just repeated was true and she answered in the affirmative. The State, in order to establish the defendant's affirmation of her story asked certain questions of Flanagan. Commander Flanagan said he asked the attorney for the defendant if he would permit the police to take a written statement from the defendant. Flanagan said that the attorney said he wished to consult with someone and that he went to the telephone and made a call. Flanagan was then asked whether after the telephone conversation he had a further conversation. The witness said he asked the attorney if he would permit his client to give us a "written statement." The defendant objected and asked that the jury be instructed to disregard any statement of the witness "in regard to asking the lawyer whether or not his client would give a written statement." The court instructed the jury to disregard the statement "in regard to asking the lawyer whether or not his client would give a written statement." The judge sustained the objection and promptly instructed the jury to disregard the evidence. The question was not answered by Flanagan. In view of the sustaining of the objection and the prompt instructions to the jury, we do not think the error was harmful. People v. Machul, 387 Ill 556, 560, 56 NE2d 811, and People v. Naujokas, 25 Ill2d 32, 36, 182 NE2d 700.

 Defendant maintains that the testimony of six neighbors in the State's rebuttal on the general

101

reputation of the State's witness, Shirley Lome, for sobriety in the neighborhood was improper when her general reputation was not in issue. Defendant testified that on the evening of September 28, Shirley Lome was "drunk." The defendant's sister, Miriam Slatin, testified that Mrs. Lome was "drunk" virtually every time she saw her in September. Miriam added that when Mrs. Lome was "drunk" she would be "staggering." In answer to the question, "She was always drinking?" Miriam Slatin answered, "Yes." The defense raised not only the issue of whether Mrs. Lome was drunk on the night before the murder, but also questioned her general habits concerning alcohol. In rebuttal the State's witnesses testified to such fact and reputation. Betty Pomerantz and Pauline Michell stated they had never seen Mrs. Lome drunk. Others testified to Mrs. Lome's good reputation for sobriety. Since the defense had questioned the general habit and character of Mrs. Lome, the State had the right to bring forth the rebuttal evidence of her neighbors to this issue. The defendant says the error in admitting the rebuttal testimony about the sobriety of Mrs. Lome was compounded when the State, in the final argument, stated that these six neighbors were charging the defendant with murder. There was no objection to the State's comment on the testimony of the neighbors. Therefore, the issue of the propriety of that argument is not preserved on appeal. People v. Donald, 29 Ill2d 283, 194 NE2d 227.

Defendant maintains that the State's evidence that deceased had three insurance policies, one in the amount of $15,000, was error and prejudicial when there was no evidence that defendant knew of the existence of the policies or that she was the beneficiary of the policies and that her motion for a mistrial should have been granted. Since the evidence of the amount of insurance was not sought or solicited by the State and since there was no evidence of the beneficiary and no attempt made

102

to use the insurance proceeds as a motive for the crime, we do not think that the single volunteered reference by the witness was harmful error particularly where the trial judge promptly struck the evidence and ordered the jury to disregard it. People v. Singer, 288 Ill 113, 122, 123 NE 327; People v. Sampson, 1 Ill2d 399, 404, 115 NE 2d 627, and People v. Rongetti, 344 Ill 278, 286, 176 NE 298.

Defendant urges that the persistent and repeated argument of the State, after objections had been sustained, requesting the jury to place themselves in the position of defense counsel, the neighbors, and in a hypothetical circumstantial situation, was prejudicial. It has always been the law that the jury must test the truth and weight of the evidence by their knowledge and judgment derived from experience, observation and reflection. People v. Turner, 265 Ill 594, 107 NE 162. They are not precluded from considering evidence in the light of their intelligence and common sense, as well as the "experience of mankind." People v. Schoos, 399 Ill 527, 78 NE2d 245; People v. Sturch, 389 Ill 82, 58 NE2d 873. It is not improper for the State's Attorney to reflect unfavorably on the defendant or to comment on her actions, if based on competent evidence. People v. Miller, 13 Ill 2d 84, 148 NE2d 455, and People v. Weaver, 18 Ill2d 108, 115, 163 NE2d 483. We do not approve the style of argument used by the prosecutors. The People call attention to the record, pages 1401, 1422, 1428 and 1445, showing indulgence in this practice by defense counsel.

Defendant says that in 10 separate instances the People argued that it was the obligation of the defendant to create or raise a reasonable doubt before she could be acquitted. The prosecutor in closing argument told the jury repeatedly that the State must prove her guilty beyond a reasonable doubt and to a moral certainty. The State argued that the evidence did not create a reasonable doubt. The defense argued that Dr. Levine's

testimony and the stolen musical instruments were points that could not be reconciled "with anything but a theory of innocence." We are of the opinion that from the arguments and the instructions of the court that the jury knew that the burden was on the State to prove the defendant guilty beyond a reasonable doubt.

The defendant urges that reference to her failure to call the codefendant Mattox to the stand, or the neighbors or members of her family, was prejudicial. The defendant introduced evidence which asserted that Shirley Lome was a "drunk" who visited Harvey Weinstein in the bedroom and that Harvey sold stolen musical instruments on the side. This evidence was brought forth by the defendant and by her maid "Goldie" West. The State commented on the failure to bring forth other witnesses to substantiate these charges. The witnesses to the Harvey-Shirley affair are not known to the State. That evidence, if it exists, is within the knowledge of the defendant or her maid. The State would not know which neighbors saw the supposed illicit traffic in trumpets or know who saw Mrs. Lome when she was "staggering." The State brought in negative evidence to show a lack of drunkenness and we think had a right to comment on the failure of defendant to support her charges. People v. Lenihan, 14 Ill App2d 490, 144 NE2d 803; U. S. v. Wright, 309 F2d 735, and People v. Swift, 319 Ill 359, 150 NE 263. The record supports the State's assertion that there was no reference by the prosecutor to defendant's failure to call codefendant Mattox as a witness.

Defendant asserts that the People's argument concerning other cases, the effect of the defendant's affair on her children and on the children of the witness, Shirley Lome, sundry other arguments and the identifying of exhibits was irrelevant and foreign to the charges, that failure of defendant to object to all of the prejudicial statements was not fatal; that the sustaining

104

of objections did not cure the error; that the prejudice deprived her of substantial means of enjoying a fair trial and that the court on its own motion should have stopped the prejudicial conduct of the trial. We think that the State's Attorney's arguments were proper and relevant. He had a right to explain the People's theory and reply to the argument of the defendant. For instance, defense counsel in closing argument said, addressing the jurors, that the State's Attorney "will have an opportunity, if he wishes to take advantage of it, to speak to you when I am finished and he will tell you, well, the State's Attorney need not prove motive. Ask him at that time, jurors, to tell you one case, in the history of our nation where a defendant was convicted for the crime of murder without proof of motive." The Assistant State's Attorney replied that he recently obtained a conviction on circumstantial evidence without motive, where the jury set the penalty at 199 years. The State's argument was in reply to the challenge by the defense. People v. McElroy, 30 Ill2d 286, 196 NE2d 651, and People v. Smith, 24 Ill2d 198, 181 NE2d 77. The State commented on the effect of defendant's illicit affair on her children to point up the falsity of the defendant's testimony that she cleaned up the blood to spare her children. The State's argument concerning "Dave" and "Morrie" was proper. The defendant raised the issue by saying that the "pawnshop" men, "Dave" and "Morrie," bought musical instruments from her husband for $10 each. The defendant said that one of the men lived next door to her Uncle Joe Cromelow, on 93rd Street. The State inquired: Did Harvey Weinstein's death stem from the defendant and Mattox or from Dave and Morrie? There was no objection to the argument. We think the record shows that the trial judge was alert to assure the defendant a fair trial.

 Defendant maintains that the court erred in sustaining objections to conversations the deceased had

105

with Dr. Chester Coggeshall and also with a friend. Defendant sought to introduce into evidence conversations between Dr. Coggeshall and Harvey Weinstein and a conversation between Harvey Weinstein and Mattox overheard by Ronald Oakes. The trial judge held that the conversations were inadmissible. Defendant made an offer of proof that Harvey Weinstein was very talkative and told the Doctor of the indiscretions his wife had committed and that Harvey had witnessed. In the offer the Doctor stated that Harvey said to the Doctor, "I'm not pure either," and that Harvey had illicit relations; that he (Harvey) had witnessed his wife's illicit relations; that Harvey had paid detectives to tail Mrs. Weinstein; that the Doctor told Harvey he would like to have Mrs. Weinstein come to his office on July 11, 1963; that Mrs. Weinstein did not deny that Harvey had seen her in a physical embrace with Mattox; that she said "Dr. I just succumbed to his physique." According to the offer of proof, that both she and Harvey were being selfish, taking into consideration their little daughters; that the Doctor saw Harvey and Mrs. Weinstein on August 1, 1963 in his office; that both admitted their indiscretions; that he advised a cooling off period; that Harvey was doubtful that the plan would work and that Mrs. Weinstein was cool but willing to try the plan.

Defendant offered to prove that Ronald Oakes would testify that in the latter part of July 1963, at the invitation of Harvey Weinstein, the witness listened in on a telephone conversation on an extension telephone between Harvey and Mattox, at which time Harvey offered to divorce defendant and offered her to Mattox, but that Mattox replied, "No," stating that he (Mattox) was leaving the state. Later in September of 1963, Oakes had a conversation with Harvey relative to Harvey's possession of stolen goods, at which time Harvey asked Oakes if he needed typewriters, some office or adding machines that were "hot stuff." Defendant says that the conversa-

tion between Harvey and Dr. Coggeshall and between Harvey and defendant and Dr. Coggeshall were not confidential or privileged communications because they were made in the presence of a third party. Defendant sought by the testimony of Ronald Oakes retelling conversations of Harvey and Mattox, to show that Harvey had an indifferent attitude concerning Mrs. Weinstein and that Mattox was "leaving the State." In another conversation, Oakes would have proved that Harvey had possession of stolen goods such as "typwriters, office or adding machines." These statements were offered as proof of theories that Harvey did not care about his wife and that Harvey was involved with Mattox in stolen property, thus supplying the motive for the murder of Harvey. We are of the opinion that the court was right in sustaining objections to the proffered testimony of Dr. Coggeshall and Ronald Oakes.

 Finally, the defendant urges that the court committed reversible error in giving People's Instruction No. 9, which reads:

> "In a case where two persons are charged with the commission of a crime, the guilt of an accused may be established without proof that the accused did every act constituting the offense.
>
> "Whoever, either before or during the commission of an offense, and with intent to promote or facilitate such commission, solicits, aids, abets, agrees or attempts to aid a person in the planning or commission of an offense is legally accountable for the conduct of such other person in the commission of such an offense.
>
> "Solicit, under the laws of this State, means to command, authorize, urge, incite, request, or advise another to commit an offense."

Defendant says that one of the dangers in the case is that the jury could be led into believing that the sexual

acts alone would be sufficient to make defendant responsible for the crime and that from the instruction the jury might believe that if through sexual acts alone she aroused Mattox that she would be accountable for the murder. The second paragraph of the Instruction is from Chap 38, sec 5-2, Paragraph (c) and the third paragraph is from Chap 38, sec 2-20 of the Criminal Code of 1961. We do not think the words "arouse" and "incite" should be interpreted to have an exclusive sexual meaning. The court did not err in giving this instruction.

For these reasons the judgment is affirmed.

Judgment affirmed.

BRYANT and LYONS, JJ., concur.